**B. L. WOOLLEY et al., Appellants,**

v.

**STANDARD OIL COMPANY OF
TEXAS, Appellee.**

No. 15617.

United States Court of Appeals
Fifth Circuit.

Feb. 10, 1956.

98

Joe A. Keith, Sherman, Tex., Alto B. Cervin, A. George Biggs, Dallas, Tex., Ralph Elliott, Sherman, Tex., for appellants, Freels, Elliott & Nall, Keith & Kennedy, Sherman, Tex., of counsel.

J. C. Hutcheson, III, Houston, Tex., James E. Henderson, Sherman, Tex., James P. Lee, Houston, Tex., for appellee, Baker, Botts, Andrews & Shepherd, Houston, Tex., Freeman, Wolfe, Henderson & Bryant, Sherman, Tex., of counsel.

Before BORAH and JONES, Circuit Judges, and BENJAMIN C., DAWKINS, Sr., District Judge.

BORAH, Circuit Judge.

This action was brought by Standard Oil Company of Texas against defendants [1] seeking a declaratory judgment that a certain oil, gas and mineral lease owned by Standard be established and declared to be in full force and effect, and that a cloud cast upon its title by a lease to B. L. Woolley, one of the defendants herein, be, in all things, removed.

The material facts which give rise to this controversy are not in dispute and may be summarized as follows: Throughout the period here involved Walter M. Clark, his wife, Cora Patterson Clark, and Ruth Patterson (now Ruth Patterson Cranfill) were the owners of two separate tracts of land in Grayson County, Texas, containing 100 acres and 25 acres, respectively. On February 7, 1945, the owners executed and delivered an oil, gas and mineral lease covering these two tracts to H. H. Coffield, who, in turn, assigned the lease to Standard on June 26, 1945. On December 18, 1947, the lessors conveyed a one-fourth interest in their mineral estate in the 100 acre tract to Donald I. Dennis, Trustee; and on August 6, 1951, they, together with J. R. Cranfill, husband of Ruth Patterson, conveyed another one-fourth interest in their undivided mineral interest in this same tract to Donald I. Dennis in his individual capacity.[2] On September 22, 1947, the lessors conveyed one-half of their mineral interest in the 25 acre tract to E. L. Foshee, who on October 1, 1947, conveyed two-thirds of his interest in the minerals to W. W. Bradley, and his wife, Mrs. W. W. Bradley by separate mineral deeds of one-sixth interest· to each. Thereafter, and on September 8, 1948, Ruth Patterson Cranfill and her husband, J. R. Cranfill, conveyed an undivided one-half interest of their undivided one-fourth interest in the oil, gas and other minerals under the 25 acre tract to H. T. Patterson and his wife, Effie Patterson.[3]

The mineral lease of February 7, 1945, which Standard seeks to have declared valid and in force contains these pertinent provisions: Paragraph 2 provides that *"subject to the other provi-*

1. The defendants herein are: Walter M. Clark and wife, Cora Patterson Clark, Ruth Patterson Cranfill and husband, J. R. Cranfill, Donald I. Dennis and wife, Reba Rudd Dennis, Donald I. Dennis, Trustee, A. E. Dennis, Al A. Ruschaupt, Theron Dunn, Mrs. Willie E. Curtis, a widow, B. L. Woolley, H. T. Patterson, and wife, Effie J. Patterson, Robert B. Patterson, E. L. Foshee, W. W. Bradley and wife, Mrs. W. W. Bradley.

2. It was stipulated that defendants Reba Rudd Dennis, A. E. Dennis, Al A. Ruschaupt, Theron Dunn and Mrs. W. A. Curtis all claim under this latter deed to Donald I. Dennis.

3. The mineral deed is to H. T. Patterson and wife, Effie Patterson, for life, with the remainder to Robert B. Patterson, and they are hereinafter referred to as "the Pattersons."

sions herein contained, the lease shall remain in force for a term of ten (10) years * * * hereinafter called 'primary term' and thereafter so long as oil, gas or other mineral is being produced from said land or any operations are being conducted hereunder on said land. * * *"[4]

Paragraph 4 provides that if drilling or mining operations are not commenced on or before February 7, 1946 (which is the first anniversary date of the lease), the "lease shall then terminate as to both parties *unless Lessee on or before said date shall pay or tender to Lessor or to the credit of Lessor* in Grayson County State Bank," the sum of $125, "hereinafter called 'rental', which shall extend for twelve (12) months from said date the time within which drilling or mining operations may be commenced. Thereafter, annually, and in like manner and upon like payments or tenders the commencement of such operations may be further deferred for successive periods of twelve (12) months each during the primary term."

Paragraph 5 of the lease contains the following provision:

"If on any rental date there be neither operations in progress for the drilling of a well or mining or reworking operations *anywhere on said land, nor production from any part thereof, this lease shall not terminate if Lessee* on or before said date *shall make or resume the payment or tender of rentals* as herein set forth * * *."

Paragraph 6 provides that the depository bank shall, regardless of changes in ownership of said land or rentals or royalties, continue as depository of any and all sums payable under the lease "and shall be the agent of Lessor, his heirs, legal representatives, devisees and assigns." It further provides:

"If more than one person is now or shall hereafter become entitled to receive rental hereunder, Lessee may nevertheless always pay or tender rental jointly to all of such persons. *If Lessee shall, in good faith and with reasonable diligence, attempt to pay any rental, but shall fail to pay or incorrectly pay some portion thereof, this lease shall not terminate unless Lessee, within thirty (30) days after written notice of its error or failure, shall fail to rectify the same.*"

Paragraph 10 provides that payments may be anticipated and made by lessee before their due date and no change of ownership or right to receive any payments, however accomplished, shall be binding on the lessee until after notice thereof shall have been furnished lessee by the person claiming the benefit thereof, and then only with respect to payments thereafter made; that notice to the lessee shall consist of certified copies of recorded instruments or legal proceedings, and until such notice shall have been furnished the lessee, the payment or tender of all sums payable under the lease may be made in the manner provided in the lease "precisely as if no such change in interest or ownership or right to receive payment had occurred. The kind of notice herein provided shall be exclusive, *and no other kind, whether actual or constructive, shall be binding on Lessee.*" Paragraph 10 also contains this further provision:

"If more than one person executes this lease as Lessor, or is now or shall hereafter become entitled * * * to share in or receive the benefits accruing to Lessor hereunder, this lease shall nevertheless always be operated and developed by Lessee as a single tract, *without regard to any such division in or change of interest or ownership, or right to receive payment, which shall not operate to enlarge the obligations or diminish the rights of Lessee.*"

Standard tendered and paid the $125 rental in accordance with the terms of

---

4.  All italics herein ours.

the lease on January 15, 1946, January 27, 1947, and January 13, 1948,[5] but paid no rental on February 7, 1949 or February 7, 1950, because on those dates there was a producing oil well on the 25 acre tract.[6] During this period when oil was being produced, and by letter of February 19, 1949, Standard advised the lessors, in answer to their inquiry concerning delay rental payments on the 100 acre tract, that under the terms of the lease production from any part of the lands "obliterates the necessity of payment of any delay rentals." In this letter, Standard also stated that: "Eventually we may desire to surrender the lease so far as the acreage in the [100 acre tract] is concerned, but for the present and pending further development, we consider the lease in full force and effect as to all of the acreage originally included therein by virtue of the production from the well" on the 25 acre tract. Thereafter, and before the well ceased production in 1950 Standard made it plain that the possible "eventuality" which it mentioned in its letter of February 19, 1949, was not then in contemplation, because it had determined to drill on or near the 100 acre tract in the future, possibly during the coming year. This affirmatively appears from the testimony of Mrs. Cora Patterson Clark in her account of what transpired on the occasion when a representative of Standard called upon her to impart this information.[7]

The well on the 25 acre tract was abandoned during 1950, and delay rentals were paid in accordance with the lease on January 18, 1951 and January 9, 1952.[8] Thereafter and on January 13, 1953, Standard mailed its check for $125 to the depository bank with instructions to deposit such check to the credit of the respective parties in amounts shown in the attached allocation instructions. These instructions were to credit to the following parties these amounts: the lessors, $9.38; Donald I. Dennis, Individually and as Trustee, $100; the Pattersons, $3.13; E. L. Foshee, $4.17; W. W. Bradley, $4.17; and Mrs. W. W. Bradley, $4.17. The bank followed the allocation instructions and on January 15, 1953, issued bank money orders to the parties named therein in the amounts specified. In forwarding its check in the correct and full amount of $125 an employee of Standard erroneously instructed the bank in respect to the allocation of the amounts which the lessors and Donald I. Dennis were entitled to receive. The error was occasioned in this manner: By letter dated February 1, 1952, prior to the due date of delay rental on February 7, but after such rental had been forwarded to the depository bank and credited to the accounts of the respective owners of interests in the lands involved, Dennis notified Standard of the two prior conveyances to him by enclosing the original deeds as evidence thereof.

5. Checks in the amount of $125, deposited to the account of the lessors jointly on January 19, 1946, January 30, 1947, and January 16, 1948, respectively.

6. Under a division order dated December 10, 1948, Standard paid a total of $14,-207.99 royalty to the lessors and J. R. Cranfill, the Pattersons, E. L. Foshee, and Mr. and Mrs. W. W. Bradley, between December 1948 and June 1950.

7. Mrs. Clark testified, in part, as follows: "We weren't drawing any rentals and we wanted to drill some more wells on the acres they were holding or else pay us the rental, or else release the lease. And [Standard's representative] said, 'You all just wait a little while.' He said, 'We have got our good news. We are to explore on or near your property, maybe, in the next year. Just don't say anything about it * * *. But anything on your farm will be purely an exploratory venture, if we ever do.' "

8. Standard's checks in the amount of $125 were made payable to Grayson County State Bank, for deposit to the credit of the parties hereafter named in the amounts as shown on allocation instructions which were attached to its checks: the lessors, $109.38; the Pattersons, $3.-13; E. L. Foshee, $4.17; W. W. Bradley, $4.17; and Mrs. W. W. Bradley, $4,-17.

One of Standard's employees who was charged with the responsibility of changing Standard's records in order to reflect these transfers, properly set out the interest Dennis had acquired in the 100 acre tract, but erroneously placed opposite his name the figure of $100 when the amount should have been $50. And by reason of this initial error, the rental due the lessors was correspondingly reduced by the amount of $50. Thus when Standard issued its instructions to the bank, it did so on the basis of its erroneous record which then showed that the lessors were entitled to only $9.38 of the rental which was $50 less than their proper share. None of the defendants ever gave Standard notice, written or otherwise, that it had incorrectly paid the portions of the delay rental which they were entitled to receive, but Standard on April 30, 1953, discovered the error it had made and promptly on the following day proceeded to rectify its error by mailing to the bank its check for $50 with instructions to deposit it to the account of the lessors, stating that "This payment is made under the provisions of paragraph 6 of said lease to rectify improper distribution of rental deposited on January 15, 1953, in Grayson County State Bank."

Thereafter, on June 11, 1953, Standard received a letter from the lessors and J. R. Cranfill returning the $9.38 money order which they had received in the distribution of the January 15, 1953 rental payment, together with the $50 tendered on May 1, 1953, stating that they were refusing to accept the rental payment on the ground that it was not paid on time and asserting that the lease had terminated. Being thus of the opinion that the lease had terminated, the lessors and J. R. Cranfill on June 25, 1953, executed and delivered an oil, gas and mineral lease on the 100 acre tract to B. L. Woolley, and this instrument was duly recorded and constitutes the alleged cloud on Standard's title.

On January 11, 1954, Standard in conformity with the provisions of the lease again forwarded its check to the bank with instructions to deposit the $125 to the credit of those parties who were entitled thereto according to the assignments of which Standard had received notice.[9] But the lessors again refused to accept their portion of the rental and have continued in their refusal to accept the 1953 and 1954 payments. Donald I. Dennis, Individually and as Trustee, has also made common cause with the lessors and notified Standard that the lease has terminated, despite the fact that all payments to him were timely and sufficient, in one instance even excessive, in amount.

In the District Court, as here, it was asserted by those who owned mineral interests and leasehold interests in the 100 acre tract that production on the 25 acre tract did not relieve Standard from paying rental on the 100 acres during 1949 and 1950, and that, therefore, the lease had terminated on that tract for nonpayment of the delay rental. It was also urged that the erroneous payment to the lessors in 1953 terminated the lease as to both tracts and as to the interests of all defendants therein, or, alternatively, that the lease was terminated at least as to all who owned mineral interests in the 100 acre tract. It was further contended that Paragraph 6 of the lease was invalid as a matter of law, or, if valid, that under the facts, Standard had failed to make a "good faith tender" of the proper rental, and hence was not entitled to invoke the provision permitting correction of its error.

The trial was had before a jury. At the conclusion of the submission of the evidence, each of the parties filed a motion for an instructed verdict on the ground that the undisputed evidence

9. Payments were allocated as follows: the lessors, $59.38; Donald I. Dennis, Individually and as Trustee, $50.00; the Pattersons, $3.13; E. L. Foshee, $4.17; W. W. Bradley, $4.17, and Mrs. W. W. Bradley, $4.17.

showed that each was entitled to a judgment in his or its favor as a matter of law. And the Court being likewise of opinion that there were no controverted material issues of fact, thereupon discharged the jury and, for reasons stated in a published opinion,[10] rendered judgment in favor of Standard, holding: (1) that, save as to the lessors and Donald I. Dennis, Standard had timely paid rentals in proper amounts to all defendants of whose interest Standard had notice,[11] and hence, the lease was clearly in force as to these parties; (2) that the lessors and Donald I. Dennis each received during the two-year period an amount sufficient to maintain the lease in effect as to their respective interests until the rental due date in February, 1954; (3) that, in any event, recent Texas decisions require that leases should be construed where possible in such a manner as to avoid a termination thereof, and there should not be read into the lease, which provides for tender to the depository bank of a sum to be deposited to the credit of the lessors, the requirement that the lessee should have issued, at its peril, correct allocation instructions; (4) that production on the 25 acre tract preserved the lease as to the 100 acre tract during 1949 and 1950; and (5) that if he was in error on the above conclusions, the principle of equitable estoppel prevented the lessors' assertion that the lease had terminated because they had received the incorrect payments and had made no complaint. The trial judge expressed considerable doubt as to the validity of Paragraph 6 of the lease, and concluded that there was no need for passing upon the question of its validity.

: [1] We agree with the trial judge that the lease was in effect as to the 25 acre tract as to all parties who had an interest therein and appellants do not argue to the contrary. We also agree that the lease is valid and in force as to the interests of Dennis in the 100 acre tract for the reason that Standard at all times after receiving notice from Dennis of his interests, properly and timely paid him the delay rental to which he was entitled. Cf. Gulf Refining Co. v. Shatford, 5 Cir., 159 F.2d 231; Mitchell v. Simms, Tex.Com.App., 63 S.W.2d 371.

■ If the trial judge was correct in his view that it was not necessary to pass upon Paragraph 6 of the lease, we must agree with him for the reasons which he gave that the principles of equitable estoppel prevent the lessors from now complaining of the erroneous allocation of delay rentals. The trial judge bottomed his holding on the authority of Humble Oil & Refining Co. v. Harrison, 146 Tex. 216, 205 S.W.2d 355, and the lessors argue here, as they did below, that this case is inapplicable because Standard did not act in "good faith" and was negligent. For answer to the lessors' contention, we deem it sufficient to say that a like argument was made and rejected by this Court in Buchanan v. Sinclair Oil & Gas Co., 5 Cir., 218 F.2d 436, where, as here, the record clearly showed that the mistake which gave rise to the deficiency in payment to the lessors was attributable solely to a patent error in computation made by an employee of the lessee. Thus, every circumstance which actuated this Court in the Buchanan case in applying the rule laid down by the Supreme Court of Texas in the Harrison case is present here.

■■ But be this as it may, we are definitely of opinion that we need not rely on the doctrine of equitable estoppel enunciated in the Harrison and Buchanan cases for the reason that Paragraph 6 of this lease clearly distinguishes it from all of the leases at issue in earlier decisions in which a failure to make proper payment of the rental was held to have brought about a termination of the rights of the lessee. The trial judge

---

10. Standard Oil Co. of Texas v. Clark, D.C., 133 F.Supp. 346.

11. The Pattersons, E. L. Foshee, and Mr. and Mrs. W. W. Bradley.

had some misgivings as to the validity of Paragraph 6, but found it unnecessary to pass upon the question of its validity. We think the question should be met head-on. In construing a lease, like any other written instrument,

"the primary and all-important consideration is the intention of the parties as gathered from the instrument. Cravens v. White, 73 Tex. 577, 11 S.W. 543, 15 Am.St.Rep. 803. * * * Even where different parts of the instrument appear to be uncertain, ambiguous, or contradictory, yet, if possible, the court will harmonize the parts and construe the instrument in such way that all parts may stand, and will never strike down any portion except there is an irreconcilable conflict wherein one part of the instrument destroys in effect another part. The strictness of the ancient rule as to repugnancy in deeds is now much relaxed, and the saner method is applied of permitting all parts of the instrument to stand where possible and to gather the intention of the parties from the whole instrument." Associated Oil Co. v. Hart, Tex.Com.App., 277 S.W. 1043, 1044.

See also, Lion Oil Co. v. Gulf Oil Corp., 5 Cir., 181 F.2d 731; Humphrys v. Skelly Oil Co., 5 Cir., 83 F.2d 989; Bouldin v. Gulf Production Co., Tex. Civ.App., 5 S.W.2d 1019.

■ Considering the lease as a whole and giving effect to every provision of the instrument, we think that the "unless" clause in Paragraph 4 operates as a special limitation on the term of the estate acquired by the lessee, notwithstanding the general limitation of ten years provided by Paragraph 2. See 8 Texas Law Review 483, 530.

However, by its very terms the provisions of Paragraph 6 operate as a limitation upon the provisions in Paragraph 4 for termination for non-payment of delay rentals.[12] It is therefore obvious that the parties intended to and did contract against the harsh rule of automatic termination which the Texas courts enforce upon the failure of a lessee to meet the stipulated conditions in an ordinary and unmodified "unless" type of lease.[13] While it is doubtless true that no appellate court in Texas has had occasion to construe a lease such as is presented here, we find nothing in the Texas law which suggests that the Supreme Court of Texas would adopt a different construction if and when it were called upon to construe a lease containing like provisions.

■■ There remains for determination whether Standard did, in fact, attempt to pay the delay rental in good faith and with due diligence. The uncontroverted evidence shows that on January 15, 1953, Standard sent the full amount of the 1953 rental to the depository bank, the agent of the lessors, and that at all times thereafter there was on file with the bank a copy of the rental receipt which showed the allocation of the entire $125 rental payment. The bank thereupon issued its money order on January 16, 1953, payable to the lessors, who, in turn, accepted and retained it for more than five months, even though it was not the correct amount to cover their interests in the two tracts. However Standard discovered the mistake in the allocation instructions on April 30, 1953, and on the following day tendered an additional amount to the lessors' credit at the depository bank. The record standing thus, we think it plain that Standard did in good faith and with reasonable

---

12. In this respect Standard's lease differs from those leases at issue in Clovis v. Carson Oil & Gas Co., D.C., 11 F. Supp. 797, Lewis v. Grininger, Okl., 179 P.2d 463, and Richfield Oil Corp. v. Bloomfield, 103 Cal.App.2d 681, 229 P. 2d 838, 839, where clauses permitting correction of lessee's errors were stricken in "unless" type leases.

13. Guerra v. Chancellor, Tex.Civ.App., 103 S.W.2d 775; Young v. Jones, Tex.Civ. App., 222 S.W. 691; Coker v. Benjamin, Tex.Civ.App., 83 S.W.2d 373.

diligence attempt to pay the rental, but incorrectly paid the lessors' portion thereof. It will not do to argue as do the lessors that Standard was negligent. Whether or not Standard was negligent is beside the point as we are concerned here only with the question of whether Standard acted in good faith. The words "good faith" and the word "negligent" are not mutually exclusive. Good faith denotes honesty of purpose and as that expression is used in law simply means "honestly, without fraud, collusion or deceit; really, actually and without pretense."[14]

Other matters urged by counsel have been considered, but we find nothing in the record to warrant us in disturbing the judgment.

Affirmed.

14. 18 Words and Phrases, Good Faith, p. 478. This definition was quoted approvingly in Peden Iron & Steel Co. v. Jenkins, Tex.Civ.App., 203 S.W. 180, 188.

See also, Walraven v. Farmers' & Merchants' Nat. Bank, 96 Tex. 331, 74 S.W. 530, 534; Dunning v. Badger, Tex.Civ. App., 74 S.W.2d 151, 155.