Mrs. J. V. WHELAN et al., Appellants,

v.

Bobby MANZIEL et al., Appellees.

No. 7035.

Court of Civil Appeals of Texas.

Texarkana.

April 8, 1958.

Rehearing Denied May 13, 1958.

Hart, Brown, Sparks & Erwin, James P. Hart, Austin, John Taylor, Marshall, Smead & Harbour, Longview, for appellants.

C. A. Brian, Marshall, H. W. Strasburger, Strasburger, Price, Kelton, Miller & Martin, Dallas, Fred Erisman, Longview, Robert Schleier, Kilgore, Gordon Brelsford, Ramey, Calhoun, Brelsford, Hull & Flock, Chilcote & Clark, Tyler, Dillard Baker, K. C. Minter, Nelson Jones, Houston, for appellees.

DAVIS, Justice.

On the 26th day of February, 1956, Mrs. J. V. Whelan, et al., filed suit in trespass to try title against Bobby Manziel, Carter-Jones Drilling Company, a partnership composed of J. K. Maxwell, W. T. Maxwell, Harry Jones and C. C. Woodruff, and

Humble Oil & Refining Company to seven tracts of land described in a single oil and gas lease executed by J. D. Whelan, J. V. Whelan, D. E. Whelan, Sister Mary Angele, born Regina Whelan, Angela Whelan and R. J. Whelan, to Humble Oil & Refining Company, which lease is dated December 10, 1945. Before the case was tried, Bobby Manziel died and Dorothy Nolan Manziel, a widow, individually and as administratrix of the estate of Bobby Manziel, deceased, Gloria Manziel Saleh and her husband, Phillip Saleh, Bobby Joe Manziel, a minor, Nolan Edward Manziel, a minor, Victoria Lynn Manziel, a minor, and Dorothy Suzanne Manziel, a minor, were made parties defendant in lieu of Bobby Manziel, deceased.

On June 7, 1946, the lessors and lessees in the foregoing lease executed a supplemental letter agreement, the construction of which letter agreement in conjunction with the lease is in truth and in fact the sole basis of this lawsuit.

Before we outline the contention of the parties, we will give a brief history of the case. In October, 1952, Humble assigned a portion of the above lease to Renwar Oil Corporation. Renwar secured production in a well drilled in an assigned portion of the lease which production commenced in October, 1952, and continued through July, 1954. Renwar designated 40 acres of land around the well as a drill site. No delay rentals were paid on any of the 1261.15 acres for the years beginning December 10, 1952, and December 10, 1953. Humble tendered to lessors delay rentals in December, 1954, on the entire lease for the final year of the primary term of said lease; lessors contend they have never accepted these delay rentals.

Prior to December 10, 1955, Humble contracted to convey to Bobby Manziel (subsequently deceased) and Carter-Jones Drilling Company, a partnership, certain interests in the lease, and prior to said date Manziel and Carter-Jones went upon the lease and commenced drilling operations.

All the defendants answered and a plea of intervention was filed by one Edward Mike Davis, claiming an assignment from Bobby Manziel to a certain interest in the lease. Humble filed a motion for summary judgment based upon the lease and the supplemental letter agreement and the other defendants filed their motions and adopted the lease exhibit of Humble, and more or less claimed as innocent purchasers in relation to the supplemental letter agreement on the theory that such letter was not filed for record and they were not charged with notice of same.

Production of oil was secured in the first well which was commenced immediately prior to December 10, 1955, and other wells were subsequently drilled. Cross-actions were filed based upon negligence, estoppel and good faith improvements, which matters by agreement of the parties were severed from the motions for summary judgment.

On the hearing on the motions for summary judgment, the motions were granted. Appellants have perfected their appeal, and bring forward two points of error which read as follows:

"1. The District Court erred in rendering summary judgment in favor of appellees for the mineral leasehold estate in the land in suit, because there was at least a fact issue raised as to whether under the supplemental letter agreement of June 7, 1946, the lease terminated (except as to the 40 acres in the Renwar well unit) when delay rentals were not paid for the year beginning December 10, 1952.

"2. The District Court erred in rendering summary judgment in favor of appellees for the mineral leasehold estate in the land in suit, because there was at least a fact issue raised as to whether under the supplemental letter

agreement of June 7, 1946, the lease terminated at the expiration of the primary term on December 10, 1955, since there was then no producing oil or gas well on the leased premises."

The supplemental letter agreement referred to in Point 1, and pleaded by Humble Company, reads as follows:

"Humble Oil & Refining Company
"Houston 1, Texas
"Geologic Lease and Scouting
Department.
"June 7, 1946.

"Mr. J. V. Whelan
"Mr. J. B. Whelan
"Mr. D. E. Whelan
"Sister Mary Angele
"born Regina Whelan
"Miss Angela Whelan
"Mr. R. J. Whelan

"Dear Mesdames and Sirs:

"Reference is made to the oil, gas and mineral lease dated December 10, 1945, which was executed by each of you as lessor to Humble Oil & Refining Company as lessee, covering seven tracts of land aggregating 1261.15 acres, more or less, in the Levi A. McLaughlin et al Surveys in Marion County, Texas.

"*In paragraph 4 of the lease,* lessee is granted the right and power to *pool or combine the acreage covered thereby or any portion thereof, with other land,* lease or leases in the immediate vicinity thereof; such pooling to be into a unit or units not exceeding 40 acres each.

"During the primary term of this lease Humble Oil & Refining Company agrees that drilling or reworking operations upon or production from any pooled unit or units embracing acreage covered by this lease shall not abate the annual delay rentals which may become due and payable as to any acreage then subject to this lease and not included in said pooled unit or units. Each of you do hereby agree that drilling or reworking operations upon or production from any pooled unit or units embracing acreage covered by this lease shall maintain the lease as to such acreage in full force and effect.

"It is further agreed and understood that at the expiration of the primary term of the lease 40 acres shall be allocated to each oil well and 640 acres to each gas well which has been drilled on the leased premises and the lease shall remain in full force and effect as to all such leased acreage so allocated in accordance with its terms and provisions; provided, however, should any governmental agency having jurisdiction prescribe or permit the spacing of gas wells on more or less acreage than that specified then the number of acres to be allocated to each gas well

Page 2
June 7, 1946

shall conform substantially with the number of acres prescribed by governmental regulations. Thereafter, the remainder of the acreage then covered by this lease shall remain subject to the terms and provisions of said lease only so long as Humble Oil & Refining Company shall conduct drilling or reworking operations thereon with no cessation of such operations for more than 60 days between the completion of one well and the commencement of operations for the drilling or reworking of another well. As to each such well completed on the leased premises after the expiration of the primary term the number of acres specified above as to either an oil well or gas well as the case may be shall be allocated to each such well and as to all such acreage the lease shall remain in full force and effect in accordance with its terms and provisions. Nothing contained in this paragraph shall be con-

strued as affecting in any manner the acreage covered by said lease which has been designated as a part of a pooled unit or units.

"All other terms and provisions of said lease shall remain in full force and effect as originally written and shall remain unchanged by this agreement.

"This letter is written for the purpose of signifying the complete agreement of the parties to said lease with respect to all matters not contained therein and if the foregoing paragraphs correctly set forth your understanding of our trade, please execute the attached copy in the space provided and return for our file.

"Very truly yours,

"Attest:

"Form Approved
by DES Jr

Humble Oil & Refining Company

"/s/ M. B. Fox---------  By /s/ David Francen
    Asst Secretary     Vice-President

Trade O.K
Morgan J Davis
By J.F.M.

"Agreed to and accepted by the undersigned:

"/s/ J. V. Whelan

"/s/ J. B. Whelan

"/s/ D. E. Whelan

"/s/ Sister Mary Angele (Regina Whelan)

"/s/ Angela Whelan

"/s/ R. J. Whelan"     (Emphasis added.)

---

Paragraph 4 of the lease reads as follows:

"Lessee, at its option is hereby given the right and power *to pool or combine* the acreage covered by this lease or any portion thereof *with other land,* lease or leases in the immediate vicinity thereof, when in Lessee's judgment it is necessary or advisable to do so in order properly to develop and operate said premises in compliance with the spacing rules of the Railroad Commission of Texas or other lawful authority, or when to do so would, in the judgment of Lessee, promote the conservation of the oil and gas in and under and that may be produced from said premises, such pooling to be into a unit or units not exceeding 40 acres each. Lessee shall execute in writing an instrument identifying and describing the pooled acreage. The entire acreage so pooled into a tract or unit shall be treated, for all purposes except the payment of royalties on production from the pooled unit, as if it were included in this lease. If production is found on the pooled acreage, it shall be treated as if production is had from this lease, whether the well or wells be located on the premises covered by this lease or not. In lieu of the royalties elsewhere herein specified, Lessor shall receive on production from a unit so pooled only such portion of the royalty stipulated herein as the amount of his acreage placed in the unit or his royalty interest therein on an acreage basis bears to the total acreage so pooled in the particular unit involved." (Emphasis added.)

There was also added to the lease a paragraph described as "4-a", as follows:

"No rentals or royalties shall be impounded or held in suspense by reason of litigation *involving other lands with which the leased premises herein may hereafter be pooled or combined,* but not involving the leased premises." (Emphasis added.)

The lease, a standard Texas form, "Producers 88 D 32678 (Revised 6–5–45) with 40-acre pooling provision" contains the usual provision for the payment of delay rentals or the commencement of drilling operations.

Appellants dwell at length in their brief upon the contents of an affidavit filed by R. J. Whelan relative to negotiations and statements prior to the execution of the lease and the supplemental letter agreement, as well as the law relative to the duty of this Court in the event an issue of fact is shown to have been raised by the record and the pleadings. It is most forcefully and earnestly urged that the affidavit of R. J. Whelan raises an issue of fact as to the construction to be placed upon the lease and supplemental letter agreement based upon the intention of the parties at the time of their execution.

Appellees have no quarrel with the law argued and cited by appellants in support of their theory that summary judgment should not be granted where fact issues are raised or there is a reasonable doubt thereof; or, that parol evidence should be admitted to establish the intention of parties to contracts where the contracts are susceptible of two or more constructions. The question of such law is not before us. The real questions are: (1) Is there ambiguity in the contract, when the lease and supplemental letter agreement are construed together as a single instrument; and (2) when such instruments are considered as a single contract, is it susceptible of more than one construction that would entitle the appellants to offer parol testimony to show the intention of the parties at the time of execution? If either question should be answered in the affirmative, then the law ar-

gued on the issues would be applicable. But both questions must be answered in the negative.

The entire supplemental letter agreement refers exclusively to paragraph 4 (the pooling provision) of the lease. Appellants contend that under the supplemental letter agreement unless there was some form of production in at least one pooled unit involving a part of the lease at the expiration of the primary term, the lease automatically expired in its entirety regardless of any drilling operations that may have commenced prior to the expiration date of the primary term. They base that contention upon the following excerpt from the letter agreement: "It is further agreed and understood that at the expiration of the primary term of the lease 40 acres shall be allocated to each oil well and 640 acres to each gas well which has been drilled on the leased premises and the lease shall remain in full force and effect as to all such leased acreage so allocated in accordance with its terms and provisions * * *" There is nothing in the lease that requires lessee or its assigns to drill and complete one or more oil or gas wells prior to the expiration of the primary term but there is a provision in Sec. 6 of the lease that provides for the commencing of operations for the drilling of a well at any time within the primary term of the lease. They would have us disregard this provision of the lease and hold that unless there was at least one well producing at the end of the primary term, the entire lease terminated.

If there had been production in one or more pooled units at the expiration of the primary term of the lease, appellee and/or its assigns would have had to commence drilling operations on the remaining portion without cessation for more than 60 days in order to hold the balance of the acreage not included in pooled units. That is clearly required by the following sentence in the fourth paragraph of the letter agreement: "Thereafter, the remainder of the acreage then covered by this lease shall remain subject to the terms and provisions of said

lease only so long as Humble Oil & Refining Company shall conduct drilling or reworking operations thereon with no cessation of such operations for more than 60 days between the completion of one well and the commencement of operations for the drilling or reworking of another well."

Further, appellants take the position that "pooled units" not only includes a unit in which acreage is included from land not covered by the lease and that a production unit from within the lease means the same thing as a pooled unit. To put it in appellants' own words: "It is our position that the words as used in the letter, 'any pooled unit or units embracing acreage covered by this lease,' are reasonably susceptible of meaning (a) a unit or units which embrace only land covered by the lease, or (b) a unit or units which include land not covered by the lease, as well as land covered by the lease, or (c) both kinds of units." A pooled unit has a definite and fixed meaning. In the case of Campbell v. Fields, 5 Cir., 229 F.2d 197, 199, Judge Jones, speaking for the Court, quoted from an article by Dean A. Allen King of the University of Tulsa, Oklahoma, wherein pooling was defined as follows: " * * * the term 'pooling' is used, and will be so used throughout this paper, to refer to the bringing together *two or more* small or irregularly-shaped tracts of land to form a drill site in connection with a program of uniform well spacing. The arrangement is essentially a species of joint venture whereby the various owners of the tracts pooled join to drill a well and to share in the benefits to be expected * * *". (Emphasis added.) The court approved this definition. A proration unit could be a unit carved from a single tract of land or from two or more tracts, provided a "pooling" contract would be entered into. But, it would require a "pooling" contract before a proration unit could be formed out of two or more tracts. See 28 Texas Law Review 662; Williams & Meyers, Manual of Oil & Gas Terms, 184. The word "pool" when used to indicate the combination of things,

indicates two or more. As used here, it means to combine a part of the lease with "other" land for drilling purposes. No "pooling unit" being formed out of any part of the lease during the primary term, the supplemental letter agreement never became effectual. There is no provision in the lease or supplemental letter agreement that would have the slightest tendency to make the terms of the supplemental letter agreement applicable to a well *not* in a "pooled unit."

When the lease and the letter agreement are considered as a whole, it is definite and clear that the intentions of the parties were: That if, during the primary term of the lease, part of the acreage covered by the lease had been *pooled with other acreage* not covered by the lease, such pooling would not defer the payment of delay rentals or drilling operations on the balance of the acreage covered by the lease and not included in a pooled unit or units.

The intention of the parties being definite and clearly stated in the lease and supplemental letter agreement, parol evidence that would change or alter the clear and unambiguous terms of the contract would not be admissible. Bumpass v. Bond, 131 Tex. 266, 114 S.W.2d 1172; and Lewis v. East Texas Finance Co., 136 Tex. 149, 146 S.W.2d 977, 980.

Appellants' points are overruled and the judgment of the trial court is affirmed.

### On Motion for Rehearing

When our opinion on appellants' motion for rehearing was finally drafted, a part of same was inadvertently omitted. Therefore, the opinion on motion for rehearing is withdrawn and the following is substituted in lieu thereof.

Appellants have filed a motion for rehearing in which they most forcefully contend that we erred in holding there was no ambiguity in the lease contract and supplemental letter agreement, and that the lease and supplemental letter agreement is not

susceptible of more than one construction; also, that no issue of fact was raised by the record in this case. We have re-examined the record and the authorities and remain of the opinion that our original decision is correct. The affidavit filed in the trial court by R. J. Whelan alleged many conditions leading up to the execution of the original lease and supplemental letter agreement that are not contained either in the lease or the supplemental letter agreement. Then we find the following statement contained in the affidavit of R. J. Whelan: *"When the lease amendment of June 7, 1946 was reduced to writing in its final form, it contained the terms and conditions upon which myself, my brothers and sisters executed the lease to the Humble Oil & Refining Company."* (Emphasis added.) If the terms and conditions of the agreement are contained in the lease amendment dated June 7, 1946, there was no need for the affidavit; although there is contradiction in the affidavit when construed in connection with the lease and the lease amendment or supplemental letter agreement of June 7, 1946, there is still no ambiguity in the lease and the supplemental letter agreement.

■■ There being no ambiguity in the lease, the intention of the parties being clearly stated, and the contract not being susceptible of two reasonable meanings, the trial court was not authorized to admit parol or extrinsic evidence to explain it. Such is the holding of our Supreme Court in the case of McMahon v. Christmann, 303 S.W. 2d 341, 344, wherein the Court speaking through Justice Calvert, said:

"In interpreting the lease it is the duty of the court to seek the intention of the parties. 31-A Tex.Jur. 179, Oil and Gas, Sec. 109. The intention of the parties, as that intention is expressed in the lease, is to be ascertained by a consideration of all of the provisions of the lease, 31-A Tex.Jur. 181, Oil and Gas, Sec. 110, and by harmonizing, if possible, those provisions which appear

to be in conflict. Woods v. Sims, 154 Tex. 59, 273 S.W.2d 617. If after established rules of interpretation have been applied there still appears to be a conflict or an ambiguity in the provisions of the lease so that it is susceptible of two reasonable meanings, then, and only then, is the court authorized to receive extrinsic evidence to resolve the conflict or ambiguity. Universal C. I. T. Credit Corp. v. Daniel, 150 Tex. 513, 243 S.W.2d 154; Lewis v. East Texas Finance Co., 136 Tex. 149, 146 S.W.2d 977."

■ Appellants also contend that we erred in holding that the lease and the supplemental letter agreement does not constitute a "pooled" or unitized lease. We did not so hold. A "pooled" or "unitized" lease is one in which two or more tracts of land are covered by a single lease by contract between the parties. Ward v. Gohlke, Tex.Civ.App., 279 S.W.2d 422, wr. ref., and authorities therein cited. There is a broad difference between a "pooled" or "unitized" lease and a "pooled unit" as provided for in the lease in question in this case. There can be a provision for pooling units provided for in a "pooled" or "unitized" lease. The lease in question in this case is a "pooled" or "unitized" lease which was made for the purpose of the contract in question. And, there is also a provision that lessee can pool any part of the lease involved with other land, thereby creating "pooled units", as defined in the foregoing opinion. The authorities relied upon by appellants to support their contention, that a pooled unit can be carved solely out of the "pooled" or "unitized" lease, all deal with leases where two or more tracts were pooled in the lease contracts, by different owners, and do not support their contention. These cases are not in point here. In a "pooled" or "unitized" lease the respective parties own an interest in the exact proportion to the interest pooled in the original lease contract. In leases such as the one in this case where a "pooled unit" is formed, the parties will own an interest in any pooled unit in pro-

portion to the amount of their respective interests included in any pooled unit under the terms of the lease.

■ Appellants also contend that we erred in holding that an issue of fact was not raised as to the payment of delay rentals and that the lease did not expire at the end of its primary term because there was no production on any part of the lease at the expiration of the primary term. The production and payment of rentals was stipulated by the parties. Appellants in their original brief stated: "Humble also failed to pay delay rentals for the period beginning December 10, 1953, but *resumed these payments on December 10, 1954,* as shown by the stipulation of the parties." (Emphasis added.) At another place in the brief appellants say: "So far as the motions for summary judgment are concerned, the question before the court, as to the payment of delay rentals, is whether there is a substantial fact issue as to the obligation of Humble to continue the payment of delay rentals under the letter of June 7, 1946, as to all leased acreage except the 40 acres included in the unit allocated to the Renwar well." The Renwar well was drilled upon a designated "drill site" wholly within the lease. Oil was produced in paying quantities from October, 1952 through July, 1954. Under the terms of the lease, no delay rentals were due for the years in which oil was produced from the well wholly within the lease in paying quantities. It was stipulated that Humble resumed payment of delay rentals on December 10, 1954. Drilling operations were commenced prior to December 10, 1955; this is not denied. No fact issue is left. The lease did not terminate upon the expiration of the primary term.

The motion for rehearing is overruled.

Appellants will be given 15 days from this date in which to file a second motion for rehearing, or 30 days from this date in which to file an application for writ of error.