**E.D. KINCAID, Jr., et al., Appellants,**

v.

**GULF OIL CORPORATION, et al., Appellees.**

**No. 04–82–00218–CV.**

Court of Appeals of Texas, San Antonio.

June 20, 1984.

Rehearing Denied July 20, 1984.

J. Ken Nunley, Dodson, Nunley & Taylor, Hondo, Earl A. Brown, Jr., Houston, for appellants.

James P. Ray, Lawrence E. Glenn, Houston, William Robert Anderson, Jr., Corpus Christi, for appellees.

Before ESQUIVEL, CANTU and REEVES, JJ.

## OPINION

CANTU, Justice.

This is an action filed by appellants, as lessors of an oil and gas lease covering 25,866.79 acres of land located in Zavala and Uvalde Counties seeking declaratory relief against appellees, lessees and assignees of interests in said lease, based upon appellant's belief that delay rentals had not been timely paid as required by the lease. Appellees are Gulf Oil Corporation, Omega Minerals, Inc., Major Petroleum Corporation, and CRB Oil & Gas, Inc. The case was tried to the District Court of Uvalde, Texas, on an agreed statement of evidence.

The facts which give rise to this appeal may be summarized as follows. On March 1, 1974, Gulf Oil Corporation (Gulf) entered into two separate leases. The leases both covered Kincaid lands. The first lease covered 25,814.19 acres and was designated by Gulf as internal lease number 212112. The following parties were named as lessors in the lease: E.D. Kincaid, Jr. and William Alex Kincaid, Independent Executors and Testamentary Trustees under the Last Will and Testament of Frank T. Kincaid, Jewel Armstrong Kincaid, widow of Frank T. Kincaid, Jewel Frances Garwood and husband, Roy H. Garwood, Jr., and Elizabeth Ann Maner and husband, James Ray Man-

er. This lease, for purposes of the opinion, will hereinafter be referred to as the F.T. Kincaid Lease. The second lease covered 25,866.79 acres and was designated by Gulf as internal lease number 212111. The following parties were lessors in the lease: E.D. Kincaid, Jr. and William Alex Kincaid, Individually and as Independent Executors under the Last Will and Testament of E.D. Kincaid, Deceased, and Mrs. Adaline Kincaid, Individually and as President of A.V.K. Ranch Company, Inc. This lease, for purposes of the opinion, will hereinafter be referred to as the E.D. Kincaid Lease. It is the E.D. Kincaid lease which is the subject matter of this appeal.

The aforementioned leases are identical in all respects with the exception of the named lessors and the tract or property descriptions. Both E.D. Kincaid, Jr. and William Alex Kincaid are named as Lessors under both leases; however, in each lease they are acting in somewhat different capacities. Although E.D. Kincaid, Jr. and William Alex Kincaid act in the stated capacities for each estate, the estates are maintained separately and independently of each other. Moreover, the leases cover contiguous tracts of land in Zavala and Uvalde Counties, Texas.

Both the E.D. Kincaid Estate lease and the F.T. Kincaid Estate lease contained an "unless" type clause as well as other provisions dealing with erroneous payment of delay rentals. Significantly, both leases contain the following language: Paragraph 2 provides that:

2. Subject to the other provisions herein contained, this lease shall be for a term of five (5) years from the date hereof (hereinafter called "primary term") and as long thereafter as oil or gas is produced in paying quantities from said land or land with which said land is pooled or unitized hereunder.

Paragraph 5 provides:

5. *If oil or gas is not being produced from the leased premises or on acreage with which the leased premises are pooled or unitized, on the first anniversary date of this lease, this lease shall then terminate as to both parties unless on or before such anniversary date Lessee shall pay or tender (or shall make a bona fide attempt to pay or tender, as hereinafter stated) to Lessors or to the credit of Lessors in the First State Bank of Uvalde at Uvalde, Texas* (which bank and its successors are Lessors' agent and shall continue as the depository for all rentals and other payments payable thereunder regardless of changes in ownership of said land or the rentals or other payments) the sum of $25,866.79 [1] (herein called rentals), which shall cover the privilege of deferring commencement of production of oil or gas for a period of twelve (12) months. In like manner and upon like payments or tenders annually, this lease may bι maintained in force and effect without the production of oil or gas from the lands covered hereby for successive periods of twelve (12) months each during the primary term. The payment or tender of rental under this paragraph and of royalty under paragraph 3 on any gas well from which gas in [sic] not being sold or used and the minimum royalty called for in paragraph 8 may be made by the check or draft of Lessee mailed or delivered to the parties entitled thereto or to said bank on or before the date of payment. If such bank (or any successor bank) should fail, liquidate or be succeeded by another bank, or for any reason fail or refuse to accept rental, the rental-paying date for any year shall be extended until the expiration of thirty (30) days after Lessors shall deliver to Lessee a proper recordable instrument naming another bank as agent to receive such payments or tenders. *If Lessee shall, on or before any anniversary date, make a bona fide attempt to pay or deposit rental to a Lessor entitled thereto according to Lessee's records or*

---

1. While the E.D. Kincaid lease provides for rentals of $25,866.79, the F.T. Kincaid lease provides for annual rental payments of $25,814.19. Nevertheless each check evidencing payment was made payable in an amount one dollar over that required.

*to a Lessor who, prior to such attempted payment or deposit, has given Lessee notice, in accordance with subsequent provisions of this lease, of his right to receive rental, and if such payment or deposit shall be ineffective or erroneous in any regard, Lessee shall be unconditionally obligated to pay to such Lessor the rental properly payable for the rental period involved, and this lease shall not terminate but shall be maintained in the same manner as if such erroneous or ineffective rental payment or deposit had been properly made, provided that the erroneous or ineffective rental payment or deposit be corrected within thirty (30) days after receipt by Lessee of written notice from such Lessor of such error accompanied by such instruments as are necessary to enable Lessee to make proper payment.* [Emphasis added.]

The leases further provide:

Except as otherwise specifically provided herein, *the breach by Lessee of any obligation arising hereunder shall not work a forfeiture or termination of this lease nor cause a termination or reversion of the estate created hereby nor be grounds for cancellation hereof in whole or in part;* and in the event Lessors consider that operations are not at any time being conducted in compliance with this lease, Lessors shall notify Lessee in writing of the facts relied upon as constituting a breach hereof, and Lessee, if in default, shall have sixty (60) days after receipt of such notice in which to commence the compliance with the obligations imposed by this lease as to which such notice is required. [Emphasis added.]

It is noteworthy that both leases provide (1) that First State Bank of Uvalde is the depository bank for payment of delay rentals (2) that delay rentals are due and payable on or before March 1 of each year of the lease term; and (3) that delay rentals are $1.00 per acre. Moreover, it is important to note that the two leases were prepared by an attorney hired by *appellants.*

From 1975 through 1978, Gulf paid annual delay rental payments under both leases by checks payable to the First State Bank of Uvalde (the Bank). Attached to these checks were credit allocation instructions.

On May 30, 1979, Gulf entered into a letter agreement with Major Petroleum Corporation (Major) covering 15,000 acres which was subsequently assigned to Omega Minerals, Inc. (Omega). CRB Oil & Gas, Inc. eventually acquired all of Omega's interest under this letter agreement. In 1979, pursuant to the terms of the leases, Gulf exercised its option to extend the primary term under the leases for five years.

In January, 1980, Gulf made the decision to pay the delay rental due on the F.T. Kincaid lease and to hold payment of the rental due on the E.D. Kincaid lease. The decision to delay payment was based on conversations between Gulf and Omega that drilling operations were being undertaken which might eliminate the delay rental obligations under the E.D. Kincaid lease.

In February, 1980, a check payable to the First State Bank of Uvalde in the amount of $25,815.19 for the delay rental obligation on the F.T. Kincaid lease was issued by Gulf and received by the Bank for the heirs of the F.T. Kincaid Estate. The lessors under the F.T. Kincaid lease were credited for the payment. E.D. Kincaid, Jr., William Alex Kincaid, E.D. Kincaid, III and Warren Neill, Vice President of Operations of the Bank, were all aware of the delay rental payment on the F.T. Kincaid lease. Thereafter, several inquiries were made by E.D. Kincaid, Jr. and William Alex Kincaid as to whether the delay rental under the E.D. Kincaid lease had been received by the Bank.

On February 29, 1980, Gulf was informed that drilling operations under the E.D. Kincaid lease had ceased. Consequently, Gulf's legal department made the decision to pay the delay rental on the E.D. Kincaid lease on or before March 1, 1980. It was decided that Omega would make the delay rental payment on behalf of Gulf because Omega's agent was closer to

Uvalde. Moreover, it was uncertain whether Gulf's bank had the facilities to wire transfer any monies after banking hours or on weekends and holidays.[2]

Thereafter, Rosamond Whitehead, an Omega employee, was instructed to issue two checks; one in the amount of $25,815.19[3] and the other in the amount of $25,867.79. She also received instructions to rent a plane, fly to Uvalde, take the checks to the Bank and inform the Bank that she was making the payment on Gulf's behalf. In preparing the checkstubs and the delay rental receipts, Whitehead used the F.T. Kincaid Estate lease for purposes of identifying the lessors who were to receive the payment. It is significant that previously, Gulf had only forwarded to Omega the F.T. Kincaid lease and had not forwarded the E.D. Kincaid lease.

Whitehead thereafter called the Bank and informed Charles Reed, Sr., Vice President of Trusts for the Bank, that an Omega agent would be delivering a delay rental check to the Bank that day on behalf of Gulf for some Kincaid properties. Because Whitehead was concerned that the check would not be delivered until after banking hours, she arranged with Reed to deliver the check to his home after banking hours if necessary.

On the afternoon of February 29, 1980, several calls were made between Gulf and the Bank. The substance of these calls was to confirm that (1) the Bank was aware that Omega was acting on Gulf's behalf; and (2) to inform the Bank that a telegram would be sent to the Bank to confirm same. The telegram was subsequently sent.[4]

It is undisputed that Reed was aware that a rental payment was to be delivered to the Bank. E.D. Kincaid III was also informed that "an oil company was bringing a lease check to the Bank." Moreover, it was presumed by Neill that the payment

to be made was for the E.D. Kincaid lease. However, since the rental was not due until March 1, the Bank was instructed by E.D. Kincaid III and Ed Vaughan, the Bank's attorney, not to accept payment after business hours on February 29th.

Thereafter, written instructions were left for Tom Rothe, the bank officer on duty on March 1, that someone was going to be delivering a check for the Kincaids and to accept it and hold it until Monday, March 3rd.

On March 1, 1980, during regular banking hours, Omega's agent delivered a check payable to the First State Bank of Uvalde in the amount of $25,867.79 and a delay rental receipt to Rothe. Rothe accepted the check and signed the delay rental receipt. On March 3, 1980, the check and the receipt were delivered to Reed. William Alex Kincaid, on March 3, 1980, looking at the check but not reading the check or the receipt, concluded that the rentals for the E.D. Kincaid lease had been paid. He, thereafter, informed E.D. Kincaid, Jr. that the delay rental for the E.D. Kincaid Estate lease had been paid.

Thereafter, E.D. Kincaid III informed Neill that the check was payable to the F.T. Kincaid Estate lease and told Neill not to credit the E.D. Kincaid Estate. He then orally instructed Vaughan, to return the check to Omega. This instruction was subsequently reduced to writing on March 7, 1980. Moreover, a letter was written to Omega by Vaughan on March 3, 1980, concerning the check. Upon receipt of this letter, Royis Ward of Omega, telephoned Vaughan and advised him that a response letter would be forthcoming. On March 5, 1980, Ward sent a letter to the Bank instructing the Bank to deposit the check delivered on March 1, 1980, to the lessors under the E.D. Kincaid Estate lease. Carbon copies of this letter were sent to Vaughan, E.D. Kincaid III and Gulf.

---

**2.** We judicially note that March 1, 1980 fell on a Saturday.

**3.** This check was ordered destroyed prior to delivery to the Bank of the $25,867.79 check.

**4.** The telegram was subsequently read to Reed by Western Union on March 1, 1980, at 8:55 a.m.

In February, 1981, Gulf tendered a delay rental check in the amount of $25,867.79 to the Bank for payment of the delay rentals under the E.D. Kincaid Estate lease. It is noteworthy that neither the delay rental check tendered by Omega to the Bank on March 1, 1980, nor the February 1981, check have been cashed by the Bank or returned to Omega nor have the lessors under the E.D. Kincaid Estate lease received credit for either check consistent with their instructions.

Appellants, in their second point of error, contend that "the trial court erred in refusing to recognize the negligence of appellee Gulf, as a primary lessor [sic] in said lease, by the delegation of its duty to pay the delay rental required by said lease in a negligent and irresponsible manner." Appellants' second point of error is, in effect, alleging that the trial court erred in refusing to recognize Gulf's alleged negligence in utilizing an agent to make the March 1, 1980 delay rental payment on Gulf's behalf.

█ The findings of fact entered by the trial court are silent as to the issue of negligence *vel non* on the part of Gulf or the other appellees. Moreover, appellants, after the findings of fact and conclusions of law were filed, failed to request any additional or amended findings of fact or conclusions of law authorized under TEX. R.CIV.P. 298. Having failed to make a request for additional or amended findings in compliance with Rule 298, appellants have waived their right to complain on appeal of the trial court's failure to make designated findings and conclusions. *Tidwell v. Lange*, 531 S.W.2d 384, 386 (Tex. Civ.App.—Waco 1975, no writ); *Law v. Law*, 517 S.W.2d 379, 383 (Tex.Civ.App.—Austin 1974, writ dism'd); *Cortez v. Corsi*, 513 S.W.2d 648, 650 (Tex.Civ.App.—Corpus Christi 1974, writ ref'd n.r.e.); TEX.R. CIV.P. 298. Appellants' second point of error is overruled.

█ Numerous contentions have been awkwardly brought to this court's attention in appellants' remaining points of error. The phraseology of these points are not in strict compliance with our Rules of Civil Appellate Procedure. *See* TEX.R. CIV.P. 418(d). However, we will attempt to address them as we understand them. *See Fambrough v. Wagley*, 140 Tex. 577, 169 S.W.2d 478 (1943). We construe appellants' contentions to be no evidence points. As such, we must view the evidence in its most favorable light in support of the court's ruling, considering only the evidence and inferences which support the finding and rejecting the evidence and inferences to the contrary. *See Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

In essence, appellants' contentions seem to challenge the following: (1) the trial court's construction of the lease; and (2) the trial court's failure to adjudge that said lease *ipso facto* terminated.

█ It is well settled that with the *usual* "unless" lease, a failure of the lessee either to begin a well or to pay the delay rentals, *ipso facto* terminates the lease on the date set out for the action and the estate reverts to the lessor without the necessity of re-entry, declaration of forfeiture or legal action. *W.T. Waggoner Estate v. Sigler Oil Co.*, 118 Tex. 509, 19 S.W.2d 27, 30 (1929). Moreover, an oil or gas lease, providing for the production of oil and payment of royalties within a given time unless delay rentals are paid conveys a determinable fee so that if the lessee fails to drill or to pay delay rentals, his lease is terminated. *Humble Oil & Refining Co. v. Harrison*, 146 Tex. 216, 205 S.W.2d 355, 360 (1947). In applying these rules, some cases have required a strict compliance by the lessee with the terms of the lease relating to the payment of delay rentals, holding that a small deficiency in the amount of the payment or a failure to make the payment until a short time after its due date terminates the lease. *Id.* at 360–361. The application of the rule has been relaxed in some cases, however. *Id.* at 361. In *Perkins v. Magnolia Petroleum Co.*, 148 S.W.2d 266 (Tex.Civ.App.—Galveston 1941, writ dism'd judgmt cor.), for example, it was held that a lessee sufficiently complied with the requirements of the payment of

delay rentals by making a joint deposit in the depository bank of the total amount due under separate leases to different lessors where the lessors were disputing the extent of their respective interests. *See id.* at 269. And in *Buchanan v. Sinclair Oil & Gas Co.,* 218 F.2d 436 (5th Cir.1955), it was held that lessors who received, without objection, smaller delay rentals than that provided for in the subject lease could not successfully contend that failure of lessee to pay the stipulated rental had terminated the lease.

We find it unnecessary, however, to rely on the doctrine of equitable estoppel enunciated in the *Humble Oil & Refining Co.* and *Buchanan* cases inasmuch as Paragraph 5 of the lease in question clearly distinguishes it from a majority of the leases at issue in earlier decisions in which a failure to make proper payment of the rental was held to have brought about a termination of the rights of the lessee. *See Woolley v. Standard Oil Co. of Texas,* 230 F.2d 97 (5th Cir.1956).

■ In construing an oil and gas lease, like any other instrument, the primary and all important consideration is the intention of the parties as gathered from the instrument. *Woolley,* 230 F.2d at 103; *Whelan v. Manziel,* 314 S.W.2d 126, 133 (Tex.Civ. App.—Texarkana 1958, writ ref'd n.r.e.) (on rehearing); *See also Associated Oil Co. v. Hart,* 277 S.W. 1043, 1044 (Tex.Comm'n App.1925, opinion adopted). We must also bear in mind that if its language is reasonably susceptible of a construction argued for by one of the parties, that prevents a forfeiture, such construction is to be preferred to one resulting in a forfeiture. *Mound Co. v. Texas Co.,* 298 F.2d 905, 908 (5th Cir.), *cert. denied,* 371 U.S. 817, 83 S.Ct. 29, 9 L.Ed.2d 57 (1962). Moreover, even where different parts of the instrument appear to be uncertain, ambiguous or contradictory, yet, if possible, the court will harmonize the parts and construe the instrument in such way that all parts may stand, and will never strike down any portion unless there is an irreconcilable conflict where one part of the instrument destroys, in effect, another part. *Associated Oil Co.,* 277 S.W. at 1044.

■ Further, the rule of construction for ambiguous instruments provides that if a contract is ambiguous or its meaning is doubtful, it will be construed most strongly against the party who drafted it. *Hinson v. Noble,* 122 S.W.2d 1082, 1087 (Tex.Civ. App.—Fort Worth 1938, no writ).

■ Considering the lease as a whole and giving effect to every provision of the instrument, we think that the "unless" clause in paragraph 5 operates as a special limitation on the term of the estate acquired by the lessee, notwithstanding the general limitation of five years provided by paragraph 2. *Woolley v. Standard Oil Co.,* 230 F.2d at 103. However, by its very terms, the provision of paragraph 5 (i.e., "or shall make a bona fide attempt to pay or tender, as hereinafter stated") operates as a limitation upon the "unless" provision for termination because of non-payment of delay rentals. It is, therefore, obvious that the parties intended to alleviate the harsh result ensuing from the rule of automatic termination upon the failure of a lessee to meet the stipulated conditions in an ordinary and unmodified "unless" type of lease. *Woolley* at 103. We know of no appellate court in Texas which has had occasion to construe a lease such as the one in the instant case; however, the United States Court of Appeals for the Fifth Circuit in the aforementioned case of *Woolley v. Standard Oil Co. of Texas* upheld a practically identical lease provision.[5]

■ There remains for determination whether appellees did, in fact, make a bona

---

5. The lease provision in *Woolley* states, in pertinent part:
   ... If Lessee shall, in good faith and with reasonable diligence, attempt to pay any rental, but shall fail to pay or incorrectly pay some portion thereof, this lease shall not terminate unless Lessee, within thirty (30) days after written notice of its error or failure, shall fail to rectify the same.
   *See Woolley v. Standard Oil Co. of Texas,* 230 F.2d 97, 99 (5th Cir.1956).

fide attempt to pay the delay rental as provided for in the E.D. Kincaid lease. The uncontroverted evidence shows that on March 1, 1980, Gulf, acting through Omega, sent the full amount of the E.D. Kincaid rental to the depository bank, the agent of the lessors, and at all times thereafter there was on file with the bank, the Omega check made out for the correct rental amount. On February 29, 1980, Gulf made the decision to pay the delay rental on the E.D. Kincaid lease because a dry hole on said lease had recently been plugged and abandoned. It was agreed that Omega, acting for Gulf would deliver the check to the Bank since Omega was closer in proximity to the Bank. Numerous telephone calls were made on behalf of Gulf and Omega in order to ensure a prompt delivery of the rentals. Thereafter, on March 1, 1980, the payment was timely made. The payment was for the full amount of the E.D. Kincaid rental and the check was at all times thereafter on file with the Bank. Although the check was made out to the proper payee, i.e., the depository bank for lessors, the credit allocations on the receipt were incorrect. When Omega learned of the mistake on March 3, 1980, it promptly replied by letter to the Bank instructing the Bank to deposit the check in the E.D. Kincaid account. The record standing thus, we think it plain that appellees did, make a bona fide attempt to pay the rental as contemplated by the lease.

The judgment of the trial court is affirmed.