162 So.2d 602 (1964)
James H. FAWVOR, Jr., et al., Plaintiffs-Appellants,
v.
U. S. OIL OF LOUISIANA, INC., et al., Defendants-Appellees.
No. 1085.
Court of Appeal of Louisiana, Third Circuit.
March 24, 1964.
Rehearing Denied April 21, 1964.
*603 Jones & Jones, by J. B. Jones, Jr., Cameron, for plaintiffs-appellants.
Plauché & Plauche, by S. W. Plauché, Jr., Lake Charles, Blanchard, Goldstein, Walker & O'Quin, by Leon O'Quin, Shreveport, Hall, Raggio & Farrar, by Thomas C. Hall, and Fred W. Ellis, Lake Charles, for defendants-appellees.
Before FRUGÉ, SAVOY and CULPEPPER, JJ.
FRUGÉ, Judge.
This is a suit to cancel a mineral lease on certain land in Cameron Parish.
The facts are not in dispute. Most of them were stipulated as a result of a pretrial conference. They are as follows:
1. Plaintiffs, joined by their father, who was then living, granted an oil, gas and mineral lease on the land to H. C. Reichert on July 27, 1959. The lease, Exhibit "A" attached to plaintiffs' petition, was on a "commercial" form, but contained a number of special provisions. The original consideration, or lease bonus, was paid in the sum of $47,471.00 by Charlton H. Lyons, Sr., to whom the land was subleased by instrument dated September 4, 1959, with Reichert retaining certain overriding royalties.
2. The first annual drilling delay rental (about which there is no dispute) was paid to the lessors, on or before July 27, 1960, in the sum of $23,735.00.
3. Others became interested in the lease with Mr. Lyons and, in the latter part of 1960, U. S. Oil acquired an undivided two-thirds working interest therein.
4. Mr. Lyons, who had acquired a title opinion from the firm of Liskow & Lewis under date of August 12, 1959, made a copy thereof available to U. S. Oil, which obtained a drilling permit on March 10, 1961, for a well to be designated as Fawvor No. 1.
5. Fawvor No. 1 was completed as a gas well on August 7, 1961, at a total cost of $432,561.51, and said well was immediately shut in, for lack of a market for gas, as authorized by the lease, particularly paragraph 6 thereof.
6. On April 20, 1961, the Commissioner of Conservation held a hearing, initiated by an application of Forest Oil Corporation, an operator of a well on the lands of D. Y. Doland, adjacent to the Fawvor lands. The application proposed the creation of certain units, with respect to a particular sand, and one of the units proposed would include a portion of the lands covered by the Fawvor lease held by U. S. Oil. U. S. Oil, through Mr. G. E. Gotschall, manager of its New Orleans office, attended the hearing.
7. Effective May 15, 1961, the Commissioner of Conservation issued Order No. 548 unitizing the Ehni-Darling sand in the Doland well and included in a unit a portion of the Fawvor lease.
8. On June 28, 1961, the Commissioner approved a survey of the unit created under Order No. 548, showing that 24.197 acres of the Fawvor lease, in accordance with *604 a survey plat dated June 20, 1961, was included in Unit No. 1 under Order No. 548.
9. On July 21, 1961, a revised plat showed the Fawvor acreage in Unit No. 1 as 26.217, as the prior plat was based on a misconception of a boundary line of the lease.
10. On July 19, 1961, Forest furnished a copy of Order No. 548, with a copy of the first survey plat to the defendants, U. S. Oil and Lyons; on July 25, 1961, Forest sent to Mr. Gotschall of U. S. Oil a copy of the revised plat dated July 21, 1961.
11. On August 9, 1961, James H. Fawvor, Jr., telephoned Mr. Lyons, advising the lease was in default for the lessee's failure to pay a drilling delay rental on or before July 27, 1961; thereafter, there were conferences, correspondence between various representatives of the lessees and the Fawvors and their attorney at that time, Mr. Oliver P. Stockwell, resulting in the continued claim by the Fawvors that the lessees had defaulted for failure to pay the rental on or before July 27, 1961, and the claim by the lessees that they were not in default.
12. On October 13, 1961, pursuant to the lease agreement, a proportionate rental payment of $16.941.65 was deposited to the credit of the Fawvors, within the period of ninety days following the shut-in of Fawvor No. 1, which had been in the process of drilling on July 27, 1961. The Fawvors refused to accept the rental so deposited and have continued to persist in that refusal to the present time.
13. On November 30, 1961, Mr. Fawvor, Sr., acting for the lessors, made a written demand for a release of the lease.
14. On October 11, 1961, Forest Oil Corporation, which had been designated as the operator of the unit in the Commissioner's order, transmitted to the owners of interests in the unit a division order, for approval and execution, setting forth the proportionate interests of the various parties in the production from the Unit No. 1 well, and the amount allocated thereon to U. S. Oil and its associate lessees included one hundred per cent of the interest allocable to the Fawvor land in the unit, including royalties due the Fawvors. U. S. Oil had previously advised Forest, in July, 1961, that it would distribute royalties on the Fawvor land attributable to the Fawvor acreage in the Doland Unit No. 1.
15. On November 6, 1961, U. S. Oil ordered a supplemental abstract of title on the Fawvor land for division order purposes, and the supplemental abstract was delivered shortly thereafter and, on November 13, 1961, was forwarded by Mr. Gotschall to Mr. Joe Louis, an attorney in the U. S. Oil office, with the request that he prepare division orders in connection with payments of royalties and other interests under the Fawvor acreage in the Doland Unit No. 1.
16. On November 7, 1961, Mr. Gotschall wrote to Mr. Fawvor, Sr. in further discussion of the proportionate rental payment that had been made in lieu of the July 27, 1961, rental and, in the postscript of that letter, stated that the Houston office of the company would be forwarding division orders for signatures to cover royalties on production from the Fawvor land included in the Doland Unit No. 1, and asked for the cooperation of the lessors in executing the division orders when received in order that U. S. Oil might be certain that the interests of the Fawvor children were correctly calculated, as a result of certain transfers made by Mr. Fawvor, Sr. to the children as reflected in the original title opinion.
17. On December 6, 1961, Mr. Louis, for U. S. Oil, transmitted separate gas and oil division orders to the Fawvors, the owners of other royalty interests and overriding royalty interests and to the owners of working interests in respect to production from the Fawvor acreage in the Doland Unit No. 1.
*605 18. The Fawvors declined to sign, approve or return the proposed division orders.
19. On January 19, 1962, Mr. Louis, for U. S. Oil, wrote the Fawvors about the division orders previously forwarded on December 6, 1961, stating that U. S. Oil would assume, in the absence of any reply, that the interests credited were correct, and that the accounting department was being instructed to make payment to the Fawvors of the royalty in the Unit No. 1 well as calculated on the division orders.
20. On January 29, 1962, royalty checks were mailed by U. S. Oil to the Fawvors, which were received on or about February 2, 1962, and the said checks have been retained by the Fawvors, but uncashed. Subsequently, monthly royalty checks have been issued, received and retained, but were uncashed.
21. On April 15, 1962, Mr. James H. Fawvor, Sr., the father of the plaintiffs, a named lessor in the lease and plaintiffs' "guiding hand" (as described by counsel for the plaintiffs), died.
22. On April 23, 1962, the Fawvor children partitioned their lands and changed the ownership of the minerals and royalties, and their attorneys, then Jones & Jones, forwarded a copy of the partition to U. S. Oil for making appropriate changes on its records relating to the lease, and inquired if division orders were desired to be executed to show the change of ownerships.
23. On May 6, 1962, U. S. Oil transmitted division orders in accordance with the change of ownership effected by the partition, and the division orders were received by plaintiffs' attorneys and delivered to Mr. James H. Fawvor, Jr. Said division orders were retained, but were never signed.
24. On June 28, 1962, U. S. Oil deposited with the bank depository named in the lease, for the credit of the plaintiffs, the sum of $22,482.02, as the rental due on or before July 27, 1962, but said rental was refused by the plaintiffs.
25. On September 12, 1962, following some preliminary negotiations, the plaintiffs employed Jones & Jones, attorneys, to obtain the cancellation of the lease and, on September 25, 1962, a formal demand for the cancellation was made by these attorneys; on October 16, 1962, this present suit was filed.
The plaintiffs sued for cancellation of the lease on the following grounds: (1) Failure to timely pay rentals due on the lease contract on or before July 27, 1961, in the sum of $22,525.65; (2) failure to pay production royalties under the lease for an appreciable length of time without justification; (3) unfair treatment of the lessors by one of the co-lessees; and (4) failure to operate upon the premises as a reasonable and prudent operator.
The district judge, in a well reasoned and scholarly opinion, held that there were no grounds for cancellation shown and dismissed plaintiffs' suit. From this judgment plaintiffs appeal.
Failure to pay delay rentals on or before July 27 1961.
The lease provided for termination on July 27, 1960, unless on or before that date the lessee either commenced drilling a well on the land or on acreage pooled therewith or paid a delay rental of $50.00 per acre. Payment of the delay rental would maintain the lessee's rights for one year. The agreement further authorized the lessee to maintain the lease without drilling for successive twelve month periods during the primary term by paying delay rentals of $50.00 per acre on or before each July 27. The first rental was paid timely on July 27, 1960. On July 27 of the following year the lessee was engaged in drilling a well on the land. Drilling of the well had commenced on May 25, 1961, and drilling operations were continuous until August 7, 1961, when the well was completed as a shut-in gas well.
*606 Paragraphs 4, 6, 15 and 16 of the lease in question provide as follows:
"4. After beginning operations on the lands or on acreage pooled therewith (or with any part thereof) and prior to the discovery and production of minerals in paying quantities, Lessee may maintain the rights granted during and after the primary term by continuing such operations without the lapse of more than ninety (90) days between abandonment of work on one well and beginning operations for drilling another; and during the primary term such operations may be discontinued and the rights granted maintained by resuming rental payments, by paying within ninety (90) days from the discontinuance of operations (regardless of the fixed rental paying date) the proportion of the fixed yearly rental that the number of days between the end of said ninety (90) days and the next ensuing rental paying date bears to the twelve months' period; but, if said ninety (90) days should expire during any year for which rentals have been paid, no further rental shall be due until the next fixed rental paying date."
* * * * * *
"6. After the discovery and production of oil, gas or any other mineral in paying quantities, either on the leased premises or on lands pooled therewith, the rights granted shall be maintained in effect during and after the primary term and without the payment of the rentals hereinabove provided for so long as oil, gas or some other mineral is being produced in paying quantities, or Lessee is carrying on operations with reasonable diligence looking to the production thereof. It is provided, however, that if, after the discovery and production of oil, gas or other minerals in paying quantities, the production thereof should cease from any cause this lease shall terminate unless Lessee resumes or restores such production, or commences additional drilling, reworking or mining operations within ninety (90) days thereafter and continues such operations without the lapse of more than ninety (90) days between abandonment of work on one well and commencement of reworking operations or operations for the drilling of another, in an effort to restore production of oil, gas or other minerals, or (if during the primary term) resumes the payment of rentals in the manner hereinabove provided for in connection with the abandonment of wells drilled. Lessee shall not be required to produce more than one mineral, the production of any one mineral in paying quantities and with reasonable diligence being sufficient to maintain all of Lessee's rights. Should Lessee by the drilling of any well located on the land or on property pooled therewith, discover gas or gaseous substances capable of production in paying quantities but which Lessee is unable to produce (or which although preveiously produced, Lessee is unable to continue to produce) because of lack of market or marketing facilities or Governmental restrictions, then Lessee's rights may be maintained in the absence of production or drilling operations, by commencing or resuming rental payments as hereinabove provided for in connection with the drilling of a non-producing well; and should such conditions occur or exist after the primary term Lessee's rights may be further extended by the commencement, resumption or continuance of such payments at the rate and in the manner herein fixed for rental payments during the primary term; provided, however, that in no event shall Lessee's rights be so extended by rental payments and without drilling operations or production of oil, gas or some other mineral for more than five consecutive years."
* * * * * *

*607 "15. Notwithstanding anything to the contrary herein contained, drilling operations on or production from the pooled unit or units established by the Commissioner of Conservation embracing land covering hereby and other land shall maintain this lease in force only as to the land included in such unit or units, whether the operations be on the land covered by this lease or on other lands in the unit. The lease may be maintained in force as to the remainder of the land in any manner herein provided for, provided that if it be by rental payments, rentals shall be payable only on the number of acres not included in such unit or units. If at the end of the primary term this lease is being maintained by operations or on production from a pooled unit or units embracing lands covered hereby and other lands, Lessee shall have the right to maintain the lease as to the land not included in such unit or units by rental payments exactly as if it were during the primary term provided that his right to pay rentals shall terminate Three (3) years after the end of the primary term."
"16. Notwithstanding anything to the contrary contained herein, drilling operations on or production from a drilling unit embracing a portion of the lands covered hereby shall maintain this lease in force only as to the land included in said drilling unit, which can not exceed more than 160 acres. The lease may be maintained in force as to the remainder of the land in any manner herein provided for, provided that if it be by rental payments, rentals shall be payable only on the number of acres not included in such drilling unit or units or included in a unit referred to in paragraph 15 above. If at the end of the primary term this lease is being maintained as to a part of the land by operations on or production from a drilling unit or units or pooled unit as provided in paragraph 15 above embracing lands covered hereby Lessee shall have the right to maintain the lease as to the land not included in such unit or units by rental payments exactly as if it were during the primary term provided that his right to pay rentals shall terminate Three (3) years after the end of the primary term."
Under the clear language of the above quoted provisions in the lease, if the well which was being drilled on July 27, 1961, was not included within a unit, the well was to constitute a well on all of the land and would prevent a termination of the lease without the necessity of any delay rental payment on that date for any part of the land. In such a situation the lessees had a period of ninety days to pay a delay rental or commence additional drilling operations. The well was shut in on August 7, 1961; delay rentals were tendered on October 13, 1961. This was well within the ninety day period. Defendants complied with the terms of the lease agreement. We can find no grounds for cancellation of the lease based on a failure to pay delay rentals timely.

Failure to pay production royalties for an appreciable length of time without justification.
Plaintiffs argue that defendants withheld production royalties from the unit without justification from the date of creation of the unit by the Conservation Commissioner in May of 1961 until issuance of royalty checks to plaintiffs in January of 1962, a period of over eight months.
Plaintiffs cite several cases which have established the rule that "failure to pay production royalties under an oil and gas lease, for any appreciable length of time, without justification, amounts to an active breach of such lease which entitles the lessor to a cancellation thereof without the necessity of placing the lessee in formal default." Bailey v. Meadows, La.App. (2d Cir.), 130 So.2d 501, 508. In the Bailey case there was a failure to pay production royalties *608 for approximately eighteen months. Other cases cited by plaintiff include Melancon v. Texas Co., 230 La. 593, 89 So.2d 135 (failure to pay royalties for 15 months without justification); Bollinger v. Texas Co., 232 La. 637, 95 So.2d 132 (failure to pay production royalties for over one year held to be grounds for cancellation); Pierce v. Atlantic Refining Co., La.App. (3rd Cir.), 140 So.2d 19 (failure to pay production royalties for seven months was unreasonable under the circumstances). But implicit in all of the above decisions is that in determining whether payment of production royalties has been unjustifiably withheld the courts must examine the facts and circumstances of each case. We cannot conclude that withholding of payments for a period of about eight months in the present case is, as a matter of law, unjustified and therefore a ground for cancellation of the lease. We must look to the facts and circumstances surrounding the non-payment for such a period.
The record shows that production royalty payments were due as a result of part of plaintiffs' land being included in a Conservation Commissioner's unit. Production resulted from a well within the unit, although it was not on the plaintiffs' land. The unit resulted from a Conservation Commissioner's hearing held on April 20, 1961, for the purpose of establishing certain units with respect to a particular sand that had been developed in the well located on the land adjacent to that of the plaintiffs. Defendants knew of the hearing and were represented there. After that hearing the Conservation Commissioner issued Order No. 548 of May 21, 1961, providing for certain units in the area. However, the units were not surveyed units and the order provided that when later surveyed and approved by the Commissioner the survey plat would show the acreage of each separately owned tract of land contained within the unit. The first survey plat, approved by the Commissioner on June 28, 1961, showed that 24.197 acres of plaintiffs' land were included within Unit No. 1. However, an error was discovered in the plat which was corrected by the Commissioner on July 21, 1961. This corrected plat showed that 26.217 acres of plaintiffs' land was included within Unit No. 1.
The above clearly shows that defendants should not have reasonably been expected to have been able to compute royalties prior to July of 1961. After that time plaintiffs made no demands for payments of royalties. Possibly this was because plaintiffs had by that time taken the position that the lease had been forfeited, anyway, for nonpayment of delay rentals on July 27, 1961. As we have discussed above, this position was unfounded. However, this position no doubt caused defendants considerable difficulty in making the proper determination of the amount of royalties due and to whom they were due. There was a great deal of correspondence and contacts made with plaintiffs to convince them that there was no breach of any obligation by failure to pay delay rentals on July 27, 1961.
In October of 1961, Forest Oil Corp., operator of the well within the unit, transmitted to owners of interests in the unit a division order for approval and execution. Defendant U. S. Oil then ordered a supplemental abstract on the plaintiffs' land for division order purposes. This abstract was issued to U. S. Oil on November 13, 1961. On December 6, 1961, U. S. Oil transmitted separate gas and oil division orders to plaintiffs for their approval and execution as a step in the payment of oil royalties under the unit well. It was necessary that plaintiffs sign these division orders as there was some confusion as to the allocation of royalties between the plaintiffs resulting from certain transfers of interests between members of plaintiffs' family. However, plaintiffs did not return the division orders. They did not even signify approval or disapproval of the division orders. Not hearing from the plaintiffs, defendant U. S. Oil nevertheless wrote to plaintiffs on January 19, 1962, stating that it would assume that the interests set forth in the division orders were correct and would make payment of *609 the royalties accordingly. On January 29, 1962, royalty checks were issued to plaintiffs. These checks were received by plaintiffs and have been retained by them uncashed. Thereafter, monthly royalty checks have been received by plaintiffs; these checks have been retained uncashed also.
Under the facts and circumstances set forth above, we cannot say that the trial judge was erroneous in concluding that the delay in payment of royalties was justified. It appears to us that if plaintiffs had co-operated with the defendants they would have received their production royalties much sooner. Plaintiffs were to blame for delay in royalty payments, not the defendants.

Unfair treatment of lessors by one of colessees.
On September 19, 1962, the Conservation Commissioner held a hearing which resulted in Fawvor No. 1 well being included in a unit. There was some geological testimony at that hearing which, if adopted, would have included more of the plaintiffs' land in the unit than that advocated by defendant U. S. Oil. Plaintiffs contend that U. S. Oil's geological testimony recommending a limit of plaintiffs' interest in the unit to a greater extent than that of other geological testimony at the hearing was a deliberate and intentional act to favor the interests of owners of adjacent lands over that of plaintiffs.
The record shows that several geological opinions were presented at the Conservation Commissioner's hearing. There was some testimony to the effect that defendant U. S. Oil's geological interpretation was somewhat unfair to the plaintiffs. Plaintiffs rely heavily on the testimony of Mr. Reichert, who was the original lessee of the land. Mr. Reichert testified as follows:
"I felt that the difference in the interpretationif they had accepted by interpretation, it would have placed more of the Fawvor acreage in the units than they did. As to a choice of a descriptive adjective, I don't know your exact meaning of the word fair. If you mean were they deliberately dishonest, I would not think so. I would think, as I stated before, it was a difference in the interpretation of the various geological pictures presented by the various geologists."
Mr. Richert's testimony does not indicate that there was any unfairness on the part of the defendant U. S. Oil toward its lessors. Defendant U. S. Oil was merely testifying before the Conservation Commissioner as to what it felt to be a proper geological opinion concerning the area. In fact, of the several geological interpretations presented at the hearing, that of defendant U. S. Oil was accepted by the Conservation Commissioner. There is no showing in the record of any unfair treatment of plaintiffs by their lessee U. S. Oil.
Paragraph 16 of the lease, quoted in full supra, provides in part that "drilling operations on or production from a drilling unit embracing a portion of the lands covered hereby shall maintain this lease in force only as to the land included in said drilling unit, which can not exceed more than 160 acres." When defendants drilled Fawvor No. 1 well there was no drilling unit established. Therefore, this had the effect of postponing the payment of delay rentals on plaintiffs' entire tract. Plaintiffs take the position that by not creating a unit the lessees arbitrarily misused the pooling clause in the lease to the detriment of the lessors. Plaintiffs maintain that it was an obvious intention of the parties that a unit of not more than 160 acres was to be declared before drilling a well.
This Court has recently held that powers granted to the lessee by a voluntary pooling clause are "subject to such restrictions as will prevent arbitrary and unfair dealings and as will therefore enforce a `standard of good faith' on the part of the mineral lessee." McDonald v. *610 Grande Corp., La.App. (3rd Cir.), 148 So. 2d 441. A reading of the lease in the case presently before us shows that the lessee was authorized to create units at its option. We find nothing in the record showing that the lessee was arbitrary, unfair or in bad faith in not creating a unit under its discretionary power to do so under the lease. We can find no basis for cancellation of the lease for failure to establish a drilling unit in connection with Fawvor No. 1.

Failure to operate as a reasonable and prudent operator.
A motion to strike this contention was sustained by the trial judge. Under Paragraph 11 of the lease, if the lessor at any time considers that operations are not being conducted in compliance with the lease, the lessor is required to notify the lessee in writing of the facts relied upon as constituting a breach and the lessee, if legally required to conduct operations in order to maintain the lease in force, has 60 days after receipt of such notice to commence operations to comply with the requirements of the lease. There was no allegation that such notice had been given. Further, the trial judge stated that at the hearing on the motion, counsel for plaintiffs stated that this ground was urged only in connection with other grounds for cancellation of the lease.
For the above reasons, we conclude that the trial judge was correct in granting the motion to strike this contention as a ground for cancellation.
For the foregoing reasons the judgment of the district court is affirmed. Plaintiffs are assessed costs of this appeal.
Affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.
TATE, J., concurs in denial of rehearing and assigns written reasons.
TATE, Judge (concurring).
In view of the strong representations by the applicant for rehearing that the majority holding herein was in conflict with Pierce v. Atlantic Refining Co., La.App., 3 Cir., 140 So.2d 19, the writer had occasion to examine the facts surrounding the delay in the lessee's failure to tender the royalties due to the landowners.
As enunciated in Bailey v. Meadows, La. App., 2 Cir., 130 So.2d 501, 508, certiorari denied, the Louisiana jurisprudence now supports "a general rule that failure to pay production royalties under an oil and gas lease, for any appreciable length of time, without justification, amounts to an active breach of such lease which entitles the lessor to a cancellation thereof without the necessity of placing the lessee in formal default." In Pierce, cited above, we held that under the circumstances therein the producer's failure to tender the royalties due to the landowner for seven months after the completion of a producing well was an unreasonably long delay "in the absence of any satisfactory explanation for it", thus entitling the landowner-lessor to cancellation of the lease without having placed the lessee in default.
Likewise, in the present instance, it seems to me, as the landowner-plaintiffs suggest, that most of the reasons advanced by the defendants for non-payment of the royalties due, do not by themselves really constitute a satisfactory explanation for their failure to pay royalties sooner: the delays in ordering supplemental abstracts and in verifying a title opinion, the delays in transmission of conservation orders and plats between lessee parties, the failure of the landowners to sign division orders which the latter thought would prejudice their rights, for instance. I do not think that the majority opinion intended to hold otherwise.
The majority holding that the present landowner-lessors are not entitled to cancellation is justified, in my opinion, by the really determinative factor that, at about *611 the time that the royalties reasonably became due, the landowners' position was that the lease had terminated for other grounds not related to the non-payment of royalties (i. e., the alleged failure to pay delay renttals on July 27, 1960). Following this, a tender by the lessee parties of royalties due would have been a useless act; in fact, even when the royalties were actually tendered in January of 1962, the royalty checks sent to the landowner-lessors were not negotiated and have never been cashed by them.
I do not mean that lessees are entitled to withhold tender indefinitely of royalties due because the landowner-lessors have taken the position that the lease has terminated. Simply, it seems to me, the failure to tender royalties sooner was not, under the circumstances of this case, so unreasonable or so long delayed, as to amount to an active breach of the lease obligation to pay royalties promptly.
We do not here have a situation where the landowners expressed any interest, informally or otherwise, for the payment of the royalties, as was the situation in Pierce.
Admittedly, if the failure to tender royalties had been unreasonable under the circumstances, the lessors need not place the lessees in formal default, since the unreasonable failure to tender royalties sooner amounted in itself to an active breach of the lease contract. Here, however, under all of the circumstances (and especially the position of the lessors, under which no tender of the royalties was required or requested), the failure of the lessee parties to tender royalties sooner amounted at most to a passive breach of the lease obligation, requiring them to be placed in default before the lease could be cancelled.
Basically, the lessee parties could not reasonably have tendered royalties sooner than May 15th (when the commissioner's unitization order issued), June 28th (when an initial plat of the conservation unit was approved by the commissioner), or July 21, 1961 (when a revised plat was finally approved by the conservation commissioner). By these orders, the acreage-proportion of the plaintiff landowners was finally fixed to determine their share of the unit production.
It was on August 9, 1961less than three months after the first date and less than a month after the last date, that the lessee parties were advised by telephone by a representative of the landowners that the lease was in default for non-payment of delay rentals (not royalties). At no time following this and before tender of the royalties in January of 1962, did the landowner-lessors advise the lessee parties of any interest on their part in obtaining any royalties dueit in fact being their position that no royalties were due, because the lease itself had expired by failure to pay the delay rentals on July 27, 1961. (As noted in the majority opinion and as apparently conceded by the landowner appellants, this latter contention was unfounded under the terms of the lease.)
Under such circumstances, where the landowners were not in fact interested in obtaining payment of the royalties, and where they made absolutely no demand or expressed any interest in obtaining payment of the royalties, and where in fact the reasonable presumption from the circumstances was that tender of such by the lessees would be a useless formality, I do not think that the leisurely processing of the royalty payments by the lessee interests constituted sufficient cause to justify the harsh remedy of cancellation of the lease.
That is, we do not have before us the normal situation, where it should be presumed by the lessee interests that the landowner desires immediate payment of the royalties to which he is entitled because of production attributable to his land. In such a situation, an unreasonable delay in the tender of royalties constitutes an active breach of the lease, which will not be excused by intra-lessee negotiations and unnecessary lessee delays in processing.
*612 Instead, the situation here concerns where the lessees, insofar as their obligation to pay royalties immediately, were lulled into a belief by the landowner-lessor's actions, that the latter were not concerned with the usual prompt action expected of lessees in the payment of royalties due the landowners. Taking this into consideration, I think the delay in the tender of royalties was not unreasonably long and was not so unjustified as to amount to an active breach of the lease.
The plaintiffs thus, as held by the majority opinion herein, are not entitled to cancellation of the lease. The writer therefore concurs in the denial of the plaintiff-landowners' application for rehearing. *713