Guy SHOWN, Jr., et al., Appellants,

v.

GETTY OIL COMPANY, et al., Appellees.

No. 16748.

Court of Appeals of Texas, San Antonio.

Dec. 1, 1982.

Rehearing Denied Jan. 10, 1983.

Edward Kliewer, San Antonio, for appellants.

Gary E. Ellison, Frank R. Parish, James T. Kells, Houston, J. Robert McKissick, J.W. Cooper, Jr., Corpus Christi, for appellees.

OPINION

Before CADENA, C.J., and CANTU and BASKIN, JJ.

BASKIN, Justice.

This appeal involves the construction of an oil, gas and mineral lease provision commonly known as a Pugh clause. Appellants, plaintiffs below, sued the defendants for a release of an oil and gas lease, to remove cloud from title, to recover title and possession and to enjoin the defendants from operations on non-unitized lease premises. The defendants denied the allegations and pleaded for declaratory judgment that the lease remain in full force and effect.

The material facts of the case are undisputed, and the parties entered written stipulation at trial. Trial was to the court, and after the court had entered judgment for the defendants, and upon demand by plaintiffs, the court entered findings of fact and conclusions of law.[1]

1. The trial court made thirty-three findings of fact which we consider too voluminous to reproduce en toto. The court made the following conclusions of law:

1. The Oil, Gas and Mineral Lease dated January 18, 1971 from Benton H. Roberts and wife, Annie Ray [sic] Roberts, Lessors, to Campbell Kilpatrick, Lessee, covering 1,080.95 acres, more or less, in the James Cummings Survey No. 105, A–629 and the George M. Casey Survey No. 104, A–268, Frio County, Texas was properly maintained and kept in full force and effect throughout the original five (5) year primary term of said lease by the accurate and timely payment of delay rentals.

2. The Unit Designation dated January 5, 1976 filed of record in Frio County, Texas, on January 13, 1976 unitizing 40 acres of the Bennett Brothers Lease and 40 acres of the Roberts Lease is valid.

3. The primary term of the Roberts Lease contained an original primary term of five (5) year [sic] from January 18, 1971 to January 18, 1976 and a three (3) year extended primary term from January 18, 1976 to January 18, 1979.

4. The operations on and subsequent production from the unit created around the Bennett Brothers No. 1 Well embracing 40 acres of the Roberts Lease and 40 acres of outside acreage prior to the end of the original primary term was in compliance with the terms of Paragraph 14 of said lease to the effect that the Defendants, by these actions, had earned an extension of the primary term for three (3) years as provided in Paragraph 14 of the Roberts Lease.

5. Under the express terms of the Roberts Lease, delay rental payments are a proper method of maintaining the non-unitized portion of the lease during the extended primary term when the lessees have earned the right to extend the original primary term into the three (3) extended primary term.

6. The proper annual delay rentals payable on the non-unitized portion of the Roberts lease during the three extended primary term were $1,040.95. Such payment for the first year of the extended primary term was made on or before the due date, January 18, 1976.

7. The payment of $1,040.95 by Frontier Royalty Company to Benton H. Roberts and wife, Annie Ray [sic] Roberts, on January 13, 1976 was a proper payment of the delay rentals due on the non-unitized portion of the Roberts Lease for the first year of the extended primary term since no written notice had been given to the Defendants of a change of ownership of the property subject to the lease as provided for in said lease.

8. The payment and credit of $1,040.95 by Frontier Royalty Company into the account of W. Guy Shown, Jr., in the Frost National Bank, San Antonio, Texas on January 16, 1976 pursuant to Shown's instructions, was a proper payment of the delay rentals due on the non-unitized portion of the lease for the first year of the extended primary term of the Roberts Lease.

9. The return of and rejection of delay rental payments by Shown on January 29, 1976

On or about January 18, 1971, Benton H. Roberts and wife, Annie Jay Roberts, owners in fee of the realty involved in this case, made an oil, gas and minerals lease of 1080.-95 acres in Frio County, hereinafter the Roberts lease, to Campbell Kilpatrick. The Roberts interest was conveyed to R.S. Ranch, Inc., on August 28, 1975, subject to the oil, gas, and mineral lease. R.S. Ranch, Inc., deeded the 1080.95 acres to Guy Shown, Jr., on January 12, 1976. By mesne conveyances by or through Shown, appellants Fletcher Brown, Stan Studer, and Clifford E. Morton obtained fee interests in the 1080.95 acres, subject to the leases.

The original primary term of the Roberts lease was five (5) years which ended January 18, 1976, at which time plaintiff Shown was owner of the fee, subject to the Roberts lease; and the extended primary term ended January 18, 1979. The extended primary term was provided for in Paragraph 14 (the "Pugh" clause):

Notwithstanding anything to the contrary herein contained, drilling operations on or production from a pooled unit or units established under the provisions of Paragraph 4 hereof embracing land covered hereby and other land shall maintain this lease in force and effect only as to land included in such unit or units. The lease may be maintained in force as to the remainder of the land both during the original and extended primary term as defined below and in any manner herein provided for; provided that, if it be by rental payment, rentals shall be payable only on the number of acres not included in such unit or units. If at the end of the original primary term this lease is being maintained as to a part of the land by operations on or production from a pooled unit or units embracing land covered hereby and other land, and is otherwise in force as to the non-unitized portion thereof the primary term hereof shall be extended as to the non-unitized portion of the lease for an additional period of three years, and Lessee shall have the right to maintain such portion of the lease in force by rental payments during such extended term exactly as if it were during the original primary term.

Annual delay rentals were timely paid in the correct amount of $1,080.95 on or before the anniversary date of January 18 for the years 1972, 1973, 1974, and 1975. There is no dispute that these delay rentals, and only these delay rentals, kept the lease in full

was inoperative to deminish [sic] the rights earned by the Defendants pursuant to their compliance with the lease provisions.

10. The 40 acres of the Roberts Lease which was pooled and unitized with outside acreage has remained in full force and effect to date as the result of the actual production from the Bennett Brothers No. 1 Well located thereon.

11. The 1,040.95 acres which was not unitized was properly maintained throughout the first year of the extended primary term by the proper payment of delay rentals.

12. The 1,040.95 acres of the non-unitized portion of the Roberts Lease has been maintained in full force and effect from the first year of the extended primary term to date as result of the actual production from the two (2) lease wells located on the non-unitized portion of the Roberts Lease, said production having been obtained during the first year of the extended primary term.

13. Defendants were not in default with regard to payment of the delay rentals due on the non-unitized portion of the Roberts Lease by virtue of their timely and proper payment of delay rentals for the first year of the extended primary term.

14. No delay rentals became due or payable for the second or third year of the extended primary term because actual production was obtained from the non-unitized portion of the lease premises before the end of the first year of the extended primary term.

15. Defendants have complied with the express terms and provisions of the Roberts Lease, particularly Paragraph 14.

16. The Roberts Lease is and remains in full force and effect at the present time by virtue of the compliance with lease terms and provisions by Defendants.

17. Defendants are entitled to continue exercising their respective rights under the Roberts Lease.

18. Plaintiffs are entitled to have returned to them the $1,040.95 which Guy Shown returned to Defendants.

19. No release of the Roberts Lease should be made because the Defendants have fully complied with the terms, provisions, and conditions of said lease, and in particular Paragraph 14 of said lease.

20. All costs of Court are assessed to the Plaintiffs, Guy Shown, Jr., Stan Studer, Clifford E. Morton and H. Fletcher Brown.

force and effect throughout the primary term as to all lands described in the lease.

In the meantime, lessee's interest in the lease was assigned by Kilpatrick to defendants, Getty Oil Company (Getty) and Amoco Production Company (Amoco). Later lessees farmed the lease out to Frontier Royalty Company (Frontier). On January 5, 1976, the then defendants pooled 40 acres of the Roberts lease with 40 acres from the Bennett Brothers lease, an adjacent lease tract. South Texas Oil & Gas Producing Company, Inc. (South Texas) began drilling operations on the Bennett Brothers portion of the pooled unit on or before January 18, 1976. The operations were continuous until the discovery and actual production of oil, gas and other minerals, production being continuous until the date of trial. The pooling was done pursuant to the terms and provision of Paragraph 4 of the Roberts lease, and the trial court has held that the unitization was valid.

On January 13, 1976, defendant, Frontier properly paid Benton H. Roberts and wife, Annie Jay Roberts $1,040.95, such funds representing the correct delay rental for the first year of the extended primary term. No written notice had been given to Getty, Amoco, or Frontier by Roberts and wife of the sale of the property covered by the Roberts lease as required in Paragraph 8 of the lease. Appellant Shown was the owner of the land subject to the Roberts lease from January 12, 1976, until August 31, 1978. The Robertses returned the funds to Frontier, and Shown instructed Frontier to pay the delay rental for the first year of the extended primary term to his credit at the Frost National Bank, San Antonio, Texas, prior to January 18, 1976. On January 16, 1976, Frontier deposited $1,040.95 in the Frost National Bank, San Antonio, Texas, by wire transfer, and these funds were received by the bank and credited to Shown's account on the same day. The trial court found that such funds represented the delay rental payment for the first year of the extended primary term.

Shown received the delay rental payment on January 16, 1976, and retained the funds until January 29, 1976, at which time Frost National Bank, pursuant to Shown's instructions, returned the funds to Frontier by wire transfer to the Texas Commerce Bank, Houston, Texas. By letter dated the same day, January 29, 1976, Shown requested a release of the unpooled portion of the Roberts lease. By letter dated February 2, 1976, Getty advised Shown that the delay rental payment returned January 29, 1976, would be held for him and re-tendered at his request.

On July 22, 1976, Frontier assigned to South Texas the leasehold estate in and to 500.475 acres out of the 1,080.95 acres covered by the Roberts lease. South Texas assigned partial interest in the leasehold estate in those acres to Concord Investment Company and various individuals. On July 26, 1976, defendant South Texas acquired a top lease from Appellant Shown in the 500.-475 acres. South Texas immediately began operations and completed W. Guy Shown Number 1 Well on August 23, 1976, and on September 9, South Texas began operations on W. Guy Shown Number 2 Well completing it as a producer on September 30. Both wells were continuing to produce at the time of trial.

Frontier assigned an interest in the remaining 540.47 acres in the Roberts lease to Energy Reserves Group, Inc., on March 14, 1977, and that group in turn assigned its interest to Energy Trading, Inc., which in turn assigned a partial interest out of its interest to Canso Oil & Gas, Inc. and Duncan A. McNaughton.

No delay rental payments have been tendered by any appellees nor received by appellants for the second and third years of the extended primary term.

By their first point of error, appellants maintain that the trial court erred in decreeing that the oil and gas lease in question is in full force and effect because Paragraph 14 of the lease does not authorize the continuation of the lease into the extended primary term upon the "mere" payment of delay rentals. By their second point of error, the appellants claim that the trial court erred in conclusions of law numbers 4,

5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, and 20 in holding that Paragraph 14 of the lease permitted the continuation of the lease into the extended primary term upon the "mere" payment of delay rentals.

Both parties cite us to *McMahon v. Christmann,* 157 Tex. 403, 303 S.W.2d 341, 344 (1957) in which the Supreme Court provides the following guidance:

> In interpreting the lease it is the duty of the court to seek the intention of the parties. 31–A TEX.JUR. 179, OIL & GAS, Sec. 109. The intention of the parties, as that intention is expressed in the lease, is to be ascertained by a consideration of all of the provisions of the lease, 31–A TEX.JUR. 181, OIL & GAS, Sec. 110, and by harmonizing, if possible, those provisions which appear to be in conflict. *Woods v. Sims,* [154 Tex. 59], 273 S.W.2d 617.

We are also reminded that the "four corners" rule of construction is that the intention of the parties, and especially that of the grantors, is to be gathered from the instrument as a whole and not from isolated parts thereof. *Texas Pacific Coal & Oil Co. v. Masterson,* 160 Tex. 548, 334 S.W.2d 436 (1960).

■ Appellants' argument under the first two points of error is that Paragraph 14, the Pugh clause, provides that drilling operations on or production from pooled units shall maintain the lease in force only as to the lands included in such unit or units, in this case the 40 acres in the Roberts lease in the pool. They assert that the remainder of the acreage subject to the Roberts lease must be kept in force independently of the pooled 40 acres. Appellants partially quote Paragraph 14 of the lease as follows:

> [I]f at the end of the original primary term this lease is being maintained as to a part of the land by operations on or production from a pooled unit or units embracing land covered hereby and other land, *and is otherwise in force as to the non-unitized portions thereof* the primary term hereof shall be extended as to the non-unitized portion of the lease for an additional period of three years. . . .

Appellants say that the key phrases are "at the end" and "is otherwise in force as to the non-unitized portions thereof." Appellants cite us to *Fox v. Thoreson,* 398 S.W.2d 88, 91 (Tex.1966), for the proposition that a primary term is that time period during which a lease may be kept alive by a lessee by virtue of drilling operations or the payment of rentals, and that the primary term is also a period of time at the end of which the estate granted will terminate unless extended by some other provision, usually one for production. Ordinarily a lease may be kept alive after the primary term only by production in paying quantities absent some savings clause such as shut-in gas well clause, drilling operations clause or continuous drilling operations clause. Delay rentals, appellants point out, are compensation paid to the lessor for the privilege of delaying drilling and production during the primary term, citing us to *State v. Magnolia Petroleum Co.,* 173 S.W.2d 186, 190 (Tex. Civ.App.—San Antonio 1943, writ ref'd w.o. m.).

Appellants argue that the expression "at the end of the original primary term" means immediately after the expiration of the five year primary term, but for this proposition we are not cited to any Texas case on oil and gas. The authority for this argument is two cases from other jurisdictions which deal with commercial leases, one of which provides that at the end of the term of the lease, lessees were to restore openings in a party wall. The other case provides that lessees were to give up possession of the premises, although permitted ingress and egress for a reasonable period of time after the termination to remove their property. These cases are not supportive of appellants' position.

Putting their interpretation of these two clauses contained in Paragraph 14 together, appellants argue that the expression "at the end of the original primary term, the lease is otherwise in force as to the non-unitized portion" really means that the lease must be "otherwise in force as to the non-unitized portion immediately *after* the expira-

tion of the original five year primary term." Their argument is that the only event that could be relied upon by lessees to keep the lease "otherwise in force" was the payment of delay rentals which kept the lease in force until January 18, 1976, but did not keep the lease in force beyond the primary term which ended on that date. Thus, they say, although drilling operations were begun on or before January 18, 1976, within the boundaries of the pooled unit, and although such operations were continuous until discovery and actual production of oil, gas and other minerals, production being continuous until the date of trial, the lease as to all the acreage other than the 40 acres terminated. This argument is made notwithstanding that delay rentals for the ensuing year were paid and that appellant Shown kept the funds for 13 days before returning them to the defendants. We cannot agree with the arguments advanced by appellants.

■ The general rule is that an oil, gas and mineral lease is indivisible by its nature. Production from any part of the lease keeps the lease in effect during the primary term and for as long as oil, gas and other minerals are being produced as to all lands described in the instrument. *Mathews v. Sun Oil Co.*, 425 S.W.2d 330 (Tex. 1968). Many, probably most, oil and gas leases contain pooling clauses which allow the lease tract or various parts of it to be pooled with other tracts to form a production unit. Unlike the Pugh clause, the normal lease with pooling clause provides that the entire lease tract will be considered held by production, whether that production is on the pooled area or on some area of the tract that has not been unitized. This result has caused some dissatisfaction among lessors, particularly where the pooled area is small and the leased tract is large.

In 1947, Lawrence G. Pugh, a lawyer in Crowley, Louisiana, drafted a clause calculated to prevent the holding of non-pooled acreage in his client's lease while certain portions of the lease acreage were being held under pooled arrangements. The early cases construing the Pugh clause were thus in Louisiana. In *Broussard v. Phillips Petroleum Co.,* 160 F.Supp. 905 (W.D.La.1958) there was a producing well which was on the leased land within the unit. As in this case, lessor sued for cancellation of part of the lease. The Pugh clause stated that any drilling operations or production from a pooled unit would hold the lease in force as to the land in the unit. Lessees failed, as required by the Pugh clause, to pay delay rentals or to drill on the land not in the unit, and the court held that the lease was cancelled for such failure as to the land not in the pooled unit.

In *Fawvor v. U.S. Oil of Louisiana, Inc.,* 162 So.2d 602 (La.Ct.App. 3d Cir.1964), writ ref'd, the court construed a Pugh clause almost identical to that contained in the Roberts lease. The clause provided for an extension of the primary term for three years, allowing for payment of delay rentals to maintain any non-unitized portion of the lease. Although delay rentals on the land not in the pool were tendered by the lessees, the lessor sued for cancellation of the lease. The trial court dismissed the suit and the court of appeals upheld the trial court's action on the grounds that such payment of delay rentals was in compliance with the terms of the lease agreement and held the non-unitized acreage.

Appellees point out to us that the only difference between the last sentence of the Pugh clause in *Fawvor* and the last sentence in Paragraph 14 of the Roberts lease is that the Roberts lease provision includes the phrase "and is otherwise in force as to the non-unitized portion thereof." Appellees say that this phrase expresses what the *Fawvor* provision implies, i.e., that the primary term may be extended if it has been properly maintained. The parties here stipulated that the Roberts lease was properly maintained throughout the original primary term, and the court in *Fawvor* gave effect to the obvious implication in that case.

■ We hold that the expression that the lease may be maintained in force as to the remainder of the land both during the original and extended primary term refers to all means of maintaining the lease provided

for; that is, operations, production, payment of delay rentals, payment of shut-in royalties, reworking operations, dry hole provision utilization, or invocation of the force majeure clause.

Since 40 acres of the 1,080.95 acre lease were pooled, 1,040.95 acres were not included in the unit and thus annual delay rentals payable for the remainder of the acreage were $1,040.95. The pooled unit having been created and operations begun during the last year of the primary term, such amount was payable on or before January 18, 1976, to hold the 1,040.95 acres into the first year of the extended primary term. Frontier having tendered that amount prior to January 18, 1976, the lease on the remaining acreage in the tract was held for the first year into the extended primary term. The operations on the Bennett Brothers portion of the unit was sufficient to maintain operations on the Roberts lease to the end of the original primary term and into the extended primary term, and it was the payment of the delay rental that secured the remaining acreage within the Roberts lease for the first year of such extended term.

We hold that the enumerated conclusions of the trial court are correct. *See Whelan v. Manziel,* 314 S.W.2d 126 (Tex.Civ.App.—Texarkana 1958, writ ref'd n.r.e.). The lease was in full force and effect as to all acreage initially leased during the primary term and the first year of the extended primary term. Appellant's first and second points of error are overruled.

By their third point of error, appellants assert that the trial court erred in conclusions of law numbers 12, 14, 15, 16, 17, 18, 19, and 20 in holding that the lease had not terminated despite the failure of defendants to tender or offer to tender delay rentals for the second and third years of the alleged extended primary term to plaintiffs or into the registry of the court.

During the first year of the extended primary term the lessees drilled two wells called W. Guy Shown No. 1 and W. Guy Shown No. 2. These were drilled and produced on the non-unitized portion of the Roberts lease, and they both resulted in actual production which extended at least to the time of trial. These drilling operations and actual production maintained the lease on the 1,040.95 acres, the entire non-unitized portion of the Roberts lease. *Mathews v. Sun Oil Co., supra.* The trial court properly concluded that no delay rentals were due or payable for the second or third years and that the lease did not terminate for failure of defendants to make timely delay rental tenders.[2]

Plaintiffs also argue that the production obtained from W. Guy Shown No. 1 and No. 2 were under the top lease granted on July 26, 1976, and did not serve to qualify as production under the original Benton Roberts lease dated January 18, 1971. We cannot agree. A top lease is a lease granted by a landowner during the existence of a recorded mineral lease which will become effective if and when the existing lease expires or is terminated. Williams and Meyers *Oil and Gas Law Manual of Terms* 1981 at 606. We view the purchase by South Texas of the top lease as nothing more than the exercise of prudence to assure that it would get the benefit of any oil, gas, or minerals found and produced. Those two wells held all 1,040.95 acres of the Roberts lease for the defendants.

Appellants third point of error is overruled, and the judgment of the trial court is in all things affirmed.

2. In their Counter-Plaintiffs' First Amended Petitions for Declaratory Judgment, lessees offered to perform all obligations under the Roberts lease, including payment of delay rentals, as the trial court might construe that they owed.