Gordon W. FRIEDRICH & Georgia North Gremmel, Appellants,

v.

AMOCO PRODUCTION COMPANY, Appellee.

No. 13–85–157–CV.

Court of Appeals of Texas, Corpus Christi.

Oct. 17, 1985.

Dan C. Perry, Banks & Banks, San Antonio, Tex., for appellants.

John T. Marshall, San Antonio, Tex., for appellee.

Before UTTER, KENNEDY and SEERDEN, JJ.

## OPINION

UTTER, Justice.

This is a suit brought by appellants against appellee to cancel two oil and gas leases as to depths below 1298 feet. The trial court granted appellee's motion for summary judgment. We affirm the judgment of the trial court.

On February 6, 1981, appellant Gordon W. Friedrich executed an "Oil, Gas and Mineral Lease" ("Friedrich Lease") to C.A. Black, Jr., as lessee, for the exploration and production of oil, gas and other minerals by Black or his assigns on Friedrich's 120 acre tract of land in Bee County, Texas. Also, on February 6, 1981, appellant Georgia North Gremmel executed an "Oil, Gas and Mineral Lease" ("Gremmel Lease") to C.A. Black, Jr., as lessee, for the exploration and production of oil, gas and other minerals by Black or his assigns on Gremmel's 200 acre tract of land in Bee County, Texas. Both the Friedrich Lease and the Gremmel Lease ("leases") contained identical provisions except for the parties and land descriptions. Each lease had a primary term of three years which expired on February 6, 1984. Also, each lease contained the following provisions:

1. [Granting clause and legal description].... This lease covers all of the *land* described above, and, in addition thereto there is hereby leased, let and demised to the same extent as if it were described herein specifically, whether the same be in said survey or in adjacent surveys, all *land* owned or claimed by Lessor adjacent or contiguous to the *land* hereinabove particularly described. For the purpose of calculating the payments hereinafter provided for, said *land* (called *"leased premises"*) is estimated to comprise [a certain amount of] *acres,* whether it actually comprises more or less.

3. The royalties to be paid by Lessee are ... (2) all or any part of the *leased premises* is included in a unit on which a shut-in well is located, or (3) this lease ceases to be maintained under some other provision hereof, whichever is the later date, and on or before the expiration of such 90 day period. Lessee may pay or tender to Lessor, or to the credit of Lessor at the depositor hereinafter designated, a sum (called "shut in rental") equal to $\frac{1}{12}$ of the amount of annual delay rental which would be payable during the primary term for the *acreage* then held by Lessee under this lease, which payment will continue this lease in force for a period of one month from the

expiration of said 90 day period, and upon like payments or tenders monthly, on or before the expiration of the last preceding month for which such payment or tender has been made, this lease shall continue in force and effect as to the *acreage* held under this lease at the time the respective payments and tenders....

4. *Lessee is granted the right and power to pool all or any part of the leased premises with any other lands, as to any stratum or strata* and as to any mineral or minerals, and as to all or any interests therein, and by whomsoever owned, for development and operation of the same as a unit or units ... Units pooled primarily for oil shall not substantially exceed 80 *acres* each in *area,* and units pooled primarily for gas shall not substantially exceed 640 *acres* each in *area* ... No unit created hereunder need conform in *area* with any other unit ... *The entire acreage included in any unit shall be considered for all purposes (except for payment of royalties and shut-in rentals) as if it were the leased premises, and, regardless of the actual location thereof on any unit created hereunder, any operations or shut-in well or production on such unit (or the undissolved portion thereof) shall be considered as on the portion of the leased premises (whether all or part) which is included in such unit (or the undissolved part thereof) under the provision of this lease. As to each unit created hereunder, there shall be allocated to the portion of the leased premises (whether all or part) included in such unit such portion of the total production from such unit as the number of surface acres of the leased premises included in such unit (as such unit from time to time may be constituted) bears to the total number of surface acres comprising such unit, and the royalties on production from such unit shall be computed only on that portion of the production so allocated to said portion of the leased premises ...*

\*  \*  \*  \*  \*  \*

13.   In the event a portion or portions of the *land* herein leased is pooled or unitized with other land so as to form a pooled unit or units, operations on, completion of a well upon, or production from such unit or units will not maintain this lease in force as to the *land* not included in such unit or units. *The lease may be maintained in force as to any land covered hereby and not included in such unit or units in any manner provided for herein; provided that if it be by rental payments, rentals shall be reduced in proportion to the number of acres covered hereby and included in such unit or units.* If at or after the end of the primary term, this lease is being maintained as to a part of the *lands* by operations on, completion of a well upon, or production from a pooled unit or units embracing *lands* covered hereby and other *land,* and if at such time there be *land* covered hereby which is not situated in such unit or units and as to which the lease is not being maintained by operations, completion of a well, or production, Lessee shall have the right to maintain the lease as to such *land* by rental payments exactly as if it were during the primary term, provided that this lease may not be so maintained in force by rental payments more than three (3) years beyond the end of the primary term.   (Emphasis added.)

On January 24, 1983, C.A. Black, Jr., assigned the leases to appellee Amoco Production Company.   On January 18, 1984, appellee Amoco Production Company assigned to Thomas S. West, Jr., both leases, only as to depths from the surface to 1298 feet.   West then pooled or unitized the combined 320 acres (in surface terms) under the leases as to depths from the surface to 1298 feet ("Georgia North Gremmel Gas Unit").   Prior to February 6, 1984 (the expiration date of the primary term of the leases), West paid the "full amount" of annual shut-in royalties under the leases to appellants for the period, February 6, 1984, to February 6, 1985.   It is undisputed that appellee Amoco Production Company did not pool or produce from that non-unitized

portion of the leasehold estates under the leases as to depths below 1298 feet and did not tender any delay rental payments prior to February 6, 1984. Subsequent to February 6, 1984 appellants demanded that appellee release its claim as to the non-unitized portion of the leasehold estates under the leases as to depths below 1298 feet. Appellee refused.

Subsequently, on August 24, 1984, appellants filed the instant suit. Appellants contended that, since appellee failed to tender any delay rental payments to extend the lease pursuant to the Pugh clause (Paragraph 13) prior to February 6, 1984, the leases as to depths below 1298 feet terminated, and the non-unitized portion of the leasehold estates under the leases as to depths below 1298 feet reverted to appellants. On January 7, 1985, appellee filed its motion for summary judgment, in which it contended that the Pugh clause in the leases did not impose a duty upon appellee to make annual delay rental payments as to the non-unitized portion of the leasehold estate under the leases as to depths below 1298 feet beyond the primary term of the leases. On February 4, 1985, the trial court granted appellee's motion for summary judgment and rendered summary judgment that appellants take nothing against appellee.

In interpreting an oil and gas lease, the primary concern of the court is to ascertain and to give effect to the intentions of the parties as expressed in the lease. This is accomplished by considering all of the provisions of the lease and by harmonizing, if possible, those provisions which may appear to be in conflict, using the applicable rules of construction. *Myers v. Gulf Coast Minerals Management Corp.*, 361 S.W.2d 193 (Tex.1962); *McMahon v. Christmann*, 157 Tex. 403, 303 S.W.2d 341 (1957); *Woods v. Sims*, 154 Tex. 59, 273 S.W.2d 617 (1954). The purpose of this is to insure, as far as is possible, that none of the provisions are rendered meaningless. *R. & P. Enterprises v. La Guarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517 (Tex.1980); *Diamond Sham-*

*rock Corp. v. Cone*, 673 S.W.2d 310 (Tex. App.—Amarillo 1984, writ ref'd n.r.e.). If a provision is so worded that it clearly discloses the intentions of the parties or is not fairly susceptible to more than one legal meaning, the provision is unambiguous. *R & P Enterprises v. La Guarta, Gavrel & Kirk, Inc.*, 596 S.W.2d at 519; *Lewis v. East Texas Finance Co.*, 136 Tex. 149, 146 S.W.2d 977 (1941). Whether a contract is ambiguous is a question of law. *R & P Enterprises v. La Guarta, Gavrel & Kirk, Inc.*, 596 S.W.2d at 518. In the absence of any ambiguity, the construction of a lease is also a question of law. *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515 (Tex.1968); *Clark v. Perez*, 679 S.W.2d 710 (Tex.App.—San Antonio 1984, no writ). Such a question of law may be properly resolved in a summary judgment proceeding. *Clark v. Perez*, 679 S.W.2d at 714. As noted by appellants, the Pugh clauses in the subject leases are typewritten, while the other provisions quoted above are printed; therefore, under the rules of construction for resolving conflicts, *if any*, the typewritten matter in the contract must be given effect over the printed matter. *McMahon v. Christmann*, 303 S.W.2d at 344.

In their first point of error, appellants contend that the Pugh clauses in the leases effected "a vertical, as well as a horizontal severance of the leasehold estate" under the leases and therefore the non-unitized portion of the leasehold estate below 1298 feet reverted to appellants upon the expiration of the primary term. Appellants take the position that the term "land" or "lands" in the Pugh clause and other provisions of the contract "should be viewed as three-dimensional, rather than measured by surface acreage."

Appellee asserts that there was no duty imposed upon appellee by the lease to pay appellants any delay rentals under the Pugh clause "to perpetuate the Leases as to the 'non-unitized' depths and strata of unitized Lease acreage." Appellee argues that since all "land" or "acreage" (in surface terms) from the leases was included in

the Georgia North Gremmel Gas Unit, the Pugh clause does not apply to the facts of this case. Appellee notes that the term "land" is defined in Paragraph 1 of the lease to mean "leased premises" "estimated to comprise [a certain amount of acres]."

We have found no Texas decision on whether the language of the Pugh clause of the subject leases creates a vertical as well as a horizontal severance of the leasehold estate. However, regarding the effect of Pugh clauses in general, the San Antonio Court of Appeals in *Shown v. Getty Oil Company*, 645 S.W.2d 555 (Tex.App.—San Antonio 1982, writ ref'd. n.r.e.), wrote:

> The general rule is that an oil, gas and mineral lease is indivisible by its nature. Production from any part of the lease keeps the lease in effect during the primary term and for as long as oil, gas and other minerals are being produced as to all lands described in the instrument. *Mathews v. Sun Oil Co.*, 425 S.W.2d 330 (Tex.1968). Many, probably most, oil and gas leases contain pooling clauses which allow the lease tract or various parts of it to be pooled with other tracts to form a production unit. Unlike the Pugh clause, the normal lease with pooling clause provides that the entire lease tract will be considered held by production, whether that production is on the pooled area or on some area of the tract that has not been unitized. This result has caused some dissatisfaction among lessors, particularly where the pooled area is small and the leased tract is large.[1]

*Shown v. Getty Oil Company*, 645 S.W.2d at 560.

Appellant relies upon *Rogers v. Westhoma Oil Company*, 291 F.2d 726 (10th Cir. 1961), where the United States Tenth Circuit Court of Appeals, applying Kansas law, concluded that the Pugh clause in the subject leases effected both a vertical and a horizontal severance of the leasehold estate. In *Rogers*, by mesne assignments, Plains Natural Gas Company (Plains) became the owner of the subject leases as to all horizons above-sea-level and Westhoma Oil Company became the owner of the leases as to all horizons below-sea-level. In an appropriate manner, Plains consolidated its above-sea-level holdings into 640 acre units: and, within the primary term of the subject leases, Plains secured production in commercial quantities from above-sea-level horizons on each of the consolidated units. No production of oil and gas was obtained during the primary term from horizons below-sea-level.

In *Rogers*, the Pugh clause provided (1) that, in the event of consolidation, the lease shall be continued "as to the premises covered hereby and included in any such consolidation of estates" by a producing gas well located on a consolidated unit or by oil production from a well on leased land (Subparagraph 9(a)) and (2) that the lease shall terminate at the expiration of the primary term as to any "tract or tracts not included in a consolidation held in force by production" unless there is production in accordance with other lease terms (Subparagraph 9(b)).

On appeal in *Rogers*, the Tenth Circuit Court of Appeals, reversing the trial court, wrote:

> \* \* \* \* \* \*
>
> We must arrive at the intent of the parties. The Pugh clauses are for the protection of the lessors to prevent lease continuation as to ununitized portions

---

**1.** In 1947, Lawrence G. Pugh, a lawyer in Crowley, Louisiana, drafted a clause calculated to prevent the holding of non-pooled acreage in his client's lease while certain portions of the lease acreage were being held under pooled arrangements. The early cases construing the Pugh clause were thus in Louisiana. In *Broussard v. Phillips Petroleum Co.*, 160 F.Supp. 905 (W.D.La. 1958) there was a producing well which was on the leased land within the unit. As in this case,

lessor sued for cancellation of part of the lease. The Pugh clause stated that any drilling operation or production from a pooled unit would hold the lease in force as to the land in the unit. Lessees failed, as required by the Pugh clause, to pay delay rentals or to drill on the land not in the unit, and the court held that the lease was cancelled for such facilities as to the land not in the pooled unit.

which are nonproducing. We find nothing in the leases which confines the application of the Pugh clauses to surface areas and vertical divisions. It is common knowledge that leases are divided both vertically and horizontally and that unitization is ordinarily on the basis of a common source of supply. While the inclusion of all surface areas in consolidations protects lessors from the hardships resulting, in the absence of a Pugh clause, from partial vertical consolidation, recognition of this fact does not solve the problem. A lease can provide for protection against continuation both of unconsolidated vertical divisions and of unconsolidated horizontal divisions. Considering these leases as a whole, we believe that a reasonable interpretation requires the conclusion that it was the intent of the parties to prohibit lease continuation as to unproductive portions without a consolidation whether such portions were the result of horizontal or vertical divisions. As the below-sea-level horizons were not included within any consolidations and as there was no production therefrom, the leases terminated as to such horizons at the end of the primary period.

*Rogers v. Westhoma Oil Company*, 291 F.2d at 731–732.

Appellants urge that, as in *Rogers*, "[t]his Court should also refuse to become entangled in the semantics of the word 'land' " and that "this Court should follow the *Rogers* court in realizing that pooling is a three-dimensional concept, and that defining 'land' merely by surface acres is too restrictive and unfair." Appellants acknowledge *Rist v. Westhoma Oil Company*, 385 P.2d 791 (Okl.1963), where the Oklahoma Supreme Court reviewed the identical Pugh clause provisions construed in *Rogers* but held in favor of the lessees. In *Rist*, the Oklahoma Supreme Court wrote:

> The question immediately arises: What leasehold estate was created by execution and delivery of this lease? . . . There can be no doubt then that the granting clause of the lease embraced the entire depth from the surface to the center of the earth since no terms limiting the lease as to depth or formation are employed. Such, of course, could have been done, and is not uncommon in the industry. We conclude from this, then, that no different intention of the parties is expressed in the granting clause than that clearly stated.
>
> Unless there is something in the consolidation paragraphs or other paragraphs modifying this intent, it will control.
>
> \* \* \* \* \* \*
>
> There is nowhere contained any language that purports to recognize or show intention that these terms are to apply or even recognize other than the customary application of vertical severance. Certainly the parties could have made reference to partial consolidation of separate horizontal structures by appropriate terms. But they say nothing as to depths, levels or strata.
>
> The words "Tract or tracts", "Premises", "lands", and "leasehold estates" do not import to our minds other than their common meaning. See *Crosbie v. National Bank of Commerce*, 86 Okl. 174, 207 P. 311. To us the contract terms are clear (Par. 9(b)) which require the payment of delay rentals by lessees as to part or portions. Can it be successfully maintained that this language makes provision for and anticipates different conditions of compliance as between lessees' assignors and lessors? We think not. The conduct of the parties indicates, and the briefs of lessors admit, that delay rentals paid by the owners of the above-sea level leasehold served to extend the lease year to year during the primary term as to all horizons. We are, therefore, unable to conclude that delay rentals on "parts" connotes an horizontal severance and that production from the upper stratum would not serve to extend the lease as to all strata.

*Rist v. Westhoma Oil Company*, 385 P.2d at 795–796.

We find *Rist* to be more persuasive. After reviewing the subject lease in its entirety, we, as in *Rist,* find no language to indicate that the provisions of the Pugh clause in terms of "land" and "number of acres covered hereby and included in such unit or units" was to apply or even recognize other than the customary application of vertical severance. We also note that the parties could have made reference to partial consolidation or pooling of separate horizontal structures, stratas or depths by appropriate terms in the lease, but they failed to do so. *Rist v. Westhoma Oil Company,* 385 P.2d at 795; *See Southland Royalty Company v. Humble Oil & Refining Company,* 151 Tex. 324, 249 S.W.2d 914 (1952).

We hold that the payment of the "full amount" of shut-in royalties pursuant to the shut-in royalty clause perpetuated the subject leases into the extended term and that appellee had no duty under the Pugh clause of the leases to tender any delay rental payments to appellants in order to perpetuate the lease. Appellants' first point of error is overruled.

Appellants in their second point assert that the trial court erred in granting appellee's motion for summary judgment because the leases were ambiguous.

We find no ambiguity in the subject Pugh Clause and hold that, pursuant to the common meaning of the terms "lease premises" and "number of acres," the term "land" was intended to mean surface acreage and not just those unitized strata or depths under the surface acreage of the land included in the unit. Further, the parties entered into the lease agreement for a primary term of the three years with the term to be extended upon production or payment of shut-in royalties or delay rentals based upon the surface acreage of the land "with no thought in mind of a severance as to horizontal divisions." *Rist v. Westhoma Oil Company,* 385 P.2d at 796. Appellants' second point of error is overruled.

The judgment of the trial court is AFFIRMED.